656 A.2d 890

**Richard A. SPRAGUE, Appellant,**

v.

**Greg WALTER, Kent Pollock, Howard Shapiro, Eugene L. Roberts, Jr., Creed C. Black, Michael Pakenham, Aaron Epstein, Philadelphia Newspapers, Inc. and Knight Newspapers, Inc.**

**Richard A. SPRAGUE,**

v.

**Greg WALTER, Kent Pollock, Howard Shapiro, Eugene L. Roberts, Jr., Creed C. Black, Michael Pakenham, Aaron Epstein, Philadelphia Newspapers, Inc., and Knight Newspapers, Inc.**

**Appeal of Philadelphia Newspapers, Inc., Appellant.**

Superior Court of Pennsylvania.

Argued April 5, 1994.

Filed Feb. 1, 1995.

Reargument Denied April 11, 1995.

4

6

12

14

James E. Beasley, Philadelphia, for Richard A. Sprague.

Robert C. Heim, Philadelphia, for Philadelphia Newspapers.

Before CIRILLO, HOFFMAN and CERCONE, JJ.

CERCONE, Judge.

This appeal is from the entry of judgment in favor of plaintiff, Richard Sprague, and against defendant, Philadelphia Newspapers, Inc. (hereinafter PNI) in this defamation case in

which the jury awarded Mr. Sprague $2.5 million in compensatory damages and $31.5 million in punitive damages. Prior to the entry of judgment, the lower court denied PNI's motion for a new trial and/or for judgment notwithstanding the verdict, and also in the alternative for a remittitur. We affirm the judgment of the lower court on compensatory damages but grant a remittitur as to punitive damages.

## I. HISTORY OF THE CASE

Richard Sprague commenced the instant action in 1973 against PNI and a group of its reporters alleging that he had been defamed as a result of four articles published in the *Philadelphia Inquirer* in March and April of that year.[1] *Inquirer* investigative reporter Greg Walter was the author or co-author/researcher of· two of the articles, the March 25 article and the April 1 article. Kent Pollock assisted Walter in writing the April 1 article. Reporter Howard Shapiro wrote the March 27 and March 31 articles in which Walter assisted in investigation.

The first three articles, March 25, 27, and 31, 1973, dealt with the court-martial trial of several officers of the Pennsylvania state police who were charged with illegally wiretapping other state police officers. Those other officers were in turn investigating alleged corruption in the Philadelphia police department. The main thrust of the fourth article of April 1, 1973, concerned the investigation of the death of one John Applegate in Philadelphia in 1963, the actions of the police in response to Applegate's death, and the role of Mr. Sprague, who at the time was the Chief of Homicide in the District Attorney's Office of Philadelphia County, in his handling of the prosecution related to Applegate's death. Mr. Sprague alleged in his complaint that the first three articles contained direct inferences and charges that Sprague was linked under suspicious circumstances to the State police wiretapping case

1. The reporters were Greg Walter, Kent Pollock, and Howard Shapiro. It was stipulated between the parties that the reporters were not necessary to be included as party defendants and that the matter should proceed as against PNI.

in a way which indicated he had wrongfully and dishonestly interfered with and manipulated phases of that case. He also alleged that the April 1 article contained a strong inferential accusation that he wrongfully and surreptitiously obstructed a homicide case (the Applegate case) in order to permit the son of a friend to escape prosecution. Such charges and inferences, Sprague asserted, were false and misleading. Mr. Sprague alleged that PNI published the articles with actual malice, knowing the articles to be false, defamatory and destructive of his excellent reputation as a public official, that defendants published the articles with reckless disregard of their falsity and with common law malice based on PNI's realization that its articles were false or that it subjectively entertained serious doubts as to the truth of its statements. *See Bose Corporation v. Consumers Union,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502, 524 n. 30 (1984); *DiSalle v. P.G. Pub. Co.,* 375 Pa.Super. 510, 546–48, 544 A.2d 1345, 1364–67 (1988) (per Cirillo, J.), *appeal denied,* 521 Pa. 620, 557 A.2d 724 (1989), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989). Mr. Sprague also alleged that after the four articles were published, PNI further defamed him by sending copies of the articles to members of the United States Senate at a time when he had been appointed as counsel in a Senate investigation. Sprague claimed that the PNI correspondence resulted in his dismissal from that post.

The first trial of this matter was conducted in 1983 before a jury, with the Honorable Charles A. Lord presiding. The jury returned a verdict in favor of Sprague consisting of $1.5 million in compensatory damages and $3 million in punitive damages. PNI appealed the judgment entered on the verdict to this court.

A panel of this court, in July, 1986, reversed the judgment of the lower court and ordered that the case be remanded for a new trial on the basis that the lower court had improperly applied the Pennsylvania Shield Law, 42 Pa.C.S.A. § 5942(a).[2]

---

**2.** The Shield Law protects individuals engaged in the business of gathering and publishing news from disclosing the sources of the

On appeal, the Pennsylvania Supreme Court not only determined that a new trial was required but that it was also necessary to instruct the jury that the invocation of the Shield Law did not establish an affirmative inference either as to the reliability of the source or as to the validity of the information received. *Sprague v. Walter*, 518 Pa. 425, 441, 543 A.2d 1078, 1086 (1988).[3]

On remand, the trial conducted a second jury trial in 1990 with the Honorable Charles P. Mirarchi, Jr. presiding.[4] At this trial, the jury awarded Sprague $2.5 million in compensatory damages and $31.5 million in punitive damages. From the judgment entered on this verdict, PNI filed the instant timely appeal, in which it raises the following issues:

 1. Were the trial court's evidentiary rulings on the issue of actual malice erroneous and prejudicial?

 a. Did the trial court err by permitting in evidence privileged medical and psychiatric records and other evidence that described in lurid detail the sexual identi-

information in any legal proceeding or government investigation. 42 Pa.C.S.A. § 5942(a). At the first trial, the lower court determined that the defendants had no constitutional right to refuse to reveal their sources. The trial court therefore ordered the defendants to disclose their sources in reference to the information which they sought to have admitted by testimony and considered by the jury at trial. *Sprague v. Walter*, 357 Pa.Super. 570, 578, 516 A.2d 706, 710 (1986), *affirmed*, 518 Pa. 425, 543 A.2d 1078 (1988) (*Sprague I*). The lower court also ordered that if PNI refused to reveal its sources, it would then be precluded from defending the action on the grounds that the articles at issue were based on information received from a reliable but undisclosed source. *Id.* Based on this ruling, the court identified the evidence the jury was to ignore in its deliberations because the defendant chose not to disclose its sources, but rather continued to invoke the Shield Law. *Id.* at 579, 516 A.2d at 710–11. It was this action by the lower court which a panel of this court found erroneous. *Id.* at 586, 516 A.2d at 714–15.

**3.** In the Superior Court opinion, the panel held that there was insufficient evidence of actual malice on the part of PNI as to the March 25 and March 27 articles but that the issue of actual malice was properly submitted to the jury as to the other two articles. *Sprague v. Walter*, 357 Pa.Super. at 601–10, 516 A.2d at 724–25. The Pennsylvania Supreme Court did not address this aspect of the Superior Court's opinion in the appeal of the Superior Court decision.

**4.** The first trial lasted thirty-five days. The second consumed fifty-five trial days and produced fifty-seven volumes of transcripts.

18

ty conflicts and other personal problems of a reporter for PNI?

 b. Did the trial court err by excluding from evidence critical information relied upon by PNI in forming its belief at the time of publication that the articles were accurate?

2. Did the trial court err by excluding evidence of Sprague's substantial income as an attorney in private practice, even though he claimed that he had suffered actual harm, and was entitled to substantial compensatory damages largely because his reputation as an attorney in private practice had been injured by PNI's alleged libel?

3. Did the trial court err by giving jury instructions that (a) permitted the jury to base liability on articles that this Court had previously held were not actionable[5]; (b) failed to include a charge on the fair report privilege; (c) disparaged PNI for protecting the confidentiality of its sources in accordance with the Pa.Shield Law; (d) effectively directed the jury to find that the articles meant what Sprague contended that they meant; and (e) summarized important evidence inaccurately and unfairly?

4. Did the trial court err in its evidentiary rulings and jury instructions pertaining to the question of punitive damages?

 a. Did the court err by permitting Sprague to aggressively advance a "continuing harm" theory of punitive damages, pursuant to which he repeatedly attacked PNI's post-publication beliefs and actions, without permitting PNI to explain and justify those beliefs and actions?

 b. Did the court err by permitting Sprague to prove that PNI's "net worth" was $102 million and to urge the jury repeatedly to award a portion of that amount as

---

5. In *Sprague I,* Judge Popovich found that the March 25 and March 27 articles were not actionable because there was no "clear and convincing" proof that these articles were "anything other than a 'summary of substantial accuracy' " of the events reported on. *Sprague v. Walter,* 357 Pa.Super. at 601, 516 A.2d at 723.

punitive damages, without permitting PNI to submit
any evidence concerning its net worth, and without
defining or explaining "net worth" in the jury instruc-
tions?

5. Was the $31.5 million punitive damages award excessive
under Pennsylvania law?

6. Was the $31.5 million punitive damages award unconsti-
tutional under the First Amendment to the United States
Constitution?

7. Did the proceedings in the trial court, which led to the
$31.5 million punitive damages award, deny PNI due
process of law under the Fourteenth Amendment to the
United States Constitution?

8. If a new trial is not ordered, should there be a substan-
tial remittitur of both compensatory and punitive dam-
ages awards?

It must be noted that PNI centers its claims for a new trial or
remittitur on the alleged errors of the trial court in its rulings
on the admissibility of evidence at trial and upon the court's
errors in its charge to the jury. Thus, we shall direct our
attention to these claims.

We will address PNI's contentions in order, but first, we
will set forth the evidence which was before the lower court.
The lower court comprehensively summarized this evidence as
follows:

Richard A. Sprague (Sprague) brought this libel action
against *The Philadelphia Inquirer*, (Inquirer), published by
Philadelphia Newspapers, Inc. (PNI) following a series of
defamatory articles appearing in March and April, 1973
editions. Sprague was First Assistant District Attorney at
the time of the defamatory publications.

The first articles (March 1973) ... accused Sprague of
involvement with illegal wiretapping. The second series of
articles (April 1973) ... accused Sprague of quashing a
homicide case in 1963, as a favor to Rocco Urella, Sr.
(Urella, Sr.), Commissioner, Pennsylvania State Police
(State Police). These articles were principally authored by

Greg Walter (Walter) with the assistance of others, including Kent Pollock (Pollock), *Inquirer* reporter[,] and Eugene L. Roberts, Jr. (Roberts) Executive Editor of *The Inquirer.*

The origin of this attack can be directly traced to the successful prosecution of Walter on criminal wiretapping charges in 1972 while he was employed as a reporter with *The Philadelphia Evening Bulletin* (Bulletin). Walter was arrested March 22, 1972 and convicted six months later. Sprague was the prosecutor.

At the time of publication Walter's Municipal Court conviction was on appeal to the Court of Common Pleas Of Philadelphia County. Following his conviction, Walter was advised by *The Bulletin* managing editor not to write any more stories. About this time, Walter suffered a mental breakdown and was hospitalized. *The Inquirer* covered Walter's arrest and conviction with articles and editorials and in December of 1972, Roberts hired Walter as a reporter.

Walter was outspoken in expressing his malice toward Sprague. Among those Walter told was Bill Wolf, a friend of Walter in 1973. Mr. Wolf testified as follows:

Q: He [Walter] just said, 'I'm going to destroy him, I'm going to get him,' is that correct?

A: Yes.

Another whom Walter told was Roberts who testified on cross examination:

Q: Mr. Roberts, you can rest assure[d] that Mr. Branch's testimony in its entirety will be in this trial. Let me further go on with you concerning Mr. Branch. When you say 'he' you mean who?

A: Greg Walter. "All right." [sic]

Q: Go ahead.

A: He (Walter) made a statement. We brought up Mr. Sprague's name in that conversation. He made a statement. He said 'I'm going to get that son of a bitch.[']

Carolyne Byrne (Byrne), Greg Walter's former girlfriend testified that they met several times per week, that because

of his (Walter's) obsession with Sprague he spoke about him quite frequently, and that Walter told her that "he would say that he was out to get Mr. Sprague, that because Mr. Sprague had successfully prosecuted him for a wiretapping charge and there were several other references to it."

Following his conviction, Walter told others that "he finally has him (Sprague)," he "was going to really . . . take care of Mr. Sprague" and that "this would be the end to him, I'm really going to finish him."

At this time a Pennsylvania Grand Jury was investigating illegal Police activity with information supplied by the Pennsylvania Crime Commission (Pa. Crime Commission) an incident arose where a State Trooper was involved in the illegal wiretapping of the [Pennsylvania] Crime Commission. The occasion of this event became the vehicle for the initial prong of Walter's crusade to "get Sprague."

On March 25, 1973, an article appeared in the Sunday edition of *The Inquirer* entitled "Ex-official Denied Report Linking Sprague to Pratko." The article purported to give the real identity of one "Nicholas Pratko", said to be the code name for a State Trooper involved in the wiretapping of the Pennsylvania Crime Commission.

. . . . .

On January 7, 1973, an article appeared in *The Inquirer* "Despite Denial Urella had Wiretapping Evidence", authored by Walter and Pollock. Plaintiff's exhibit 130. It was clear that "Pratko" was the undercover name of Metro Kardash (Kardash), a Pennsylvania State Trooper who was court-martialed for the alleged incident. In March 17, 1973, *The Bulletin* identified Pratko as Kardash.

On March 27, 1973 Howard F. Shapiro (Shapiro), an *Inquirer* reporter, authored the article entitled, "Witness Ties Sprague to Mystery Figure in Trooper Wiretap Case." This article states "Sergeant Matthew E. Hunt, Commander of a State Crime Commission Police Unit investigating alleged police corruption in Philadelphia, told the court-martial board that a confidential informant 'told me the

name (Nicholas Pratko) was Dick Sprague, that he thought it was Dick Sprague.'" Shapiro admitted that the article should have made it "clear . . . that Sgt. Hunt wasn't saying something he believed."

. . . . .

On March 31, 1973, *The Inquirer* headlined "Final Decision on Trooper Wiretap Now Rests with Police Commissioner." The article goes on to involve Sprague even though he was not the subject of the investigation. "Philadelphia's First Assistant District Attorney, Richard Sprague, also was mentioned during the court-martial. "Sgt. Matthew Hunt said Sprague allegedly had used an alias in the registration of an unmarked State Police car linked to the bugging incident."

The article dealt with the final decision to be made by the State Police Commissioner, James E. Barges, in the wiretapping court-martial of the State Troopers, Kardash, accused of wrongdoing. The articles above quoted were changed from the original hard copy (by Shapiro) which originally read:

> Indeed, even Philadelphia's Richard Sprague, First Assistant District Attorney, was mentioned in hearsay evidence. Sgt. Matthew Hunt, Commander of the wiretapped police unit linked Sprague's name to an alias who allegedly is registered to the unmarked state police car used in the bugging incident.

The revised version eliminates the hearsay reference to the fact, that, there never was any evidence.

*The Inquirer* had the telephone company record and the Attorney General's prosecution memorandum stating that "Pratko is an assumed name used by Corporal Metro Kardash."

In a report to Colonel James D. Barges, Commander of the Pennsylvania State Police, Hunt said ". . . the entire situation surrounding Mr. Sprague has been taken completely out of context . . . there never has been a report submitted to the Pennsylvania Crime Commission, by any

member of the State Police detail, including myself, which alluded to any connection between Mr. Sprague and Nicholas Pratko.

No one from *The Inquirer* ever contacted Sgt. Hunt relative to the link between Pratko and Sprague.

. . . . .

On April 1, 1973, *The Inquirer* headlined a front page story "Did Sprague Quash Homicide Case as Favor to Urella". The story was continued to page fourteen (14) with a full page heading, "Sprague, Urella tied to Wiretap, Homicide Case."

The article refers to a "new link" in the wiretapping controversy, via Sprague and Urella, Sr. The article accused Sprague of quashing a homicide investigation ten years earlier, when Sprague was Chief of Homicide for the District Attorney's Office, as a favor to a friend.

. . . . .

Before publication of the April 1st article Walter insisted on interviewing Sprague about his ten year old case; knowing that in March 1973 Sprague was in Erie, Pennsylvania prosecuting William Prater for the murder of Jack [sic] Yablonski, his wife and daughter. Nevertheless, Walter insisted on questioning Sprague about this ten year old case. On March 15, 1973, Sprague responded to Roberts that his pressing duties in the Yablonski case, and the staleness of the "Applegate" case, prevented him from responding to the substance within the two day deadline set forth by Walter. Sprague also pointed out to Roberts that he had prosecuted Walter for a criminal charges [sic], that the matter was still "awaiting trial" and that Walter was reported to be threatening to "get" and "smear" him. *The Inquirer* responded with the headline "Sprague won't see reporters."

In addition, Sprague wrote additional letters to Roberts and John L. Knight, Chairman of the Board, Knight Newspaper (the parent company of PNI), advising them of Walter's threats. These communications were not answered.

*The Inquirer* did respond with the April 1, 1973 article, the hub of which was that Rocco Urella, JR. [sic] (Urella, Jr.) should have been prosecuted for the murder of Applegate. Also, that Sprague quashed the homicide prosecution as a favor to Urella, Sr. and Sprague did not properly investigate the crime.

. . . . .

The facts surrounding the death of Applegate are without contradiction. Two young pre-medical students, Urella, Jr. and Donald Scalessa (Scalessa) went out drinking on Saturday night, March 2, 1963. They met Applegate, who lived up the street from the bar. At closing time, Applegate, invited the boys to his apartment, promising to have some girls over to continue the party.

Upon arriving, they met Franklin Funk (Funk) who was extremely drunk. Applegate had told the boys he was married and had a daughter. However, unbeknownst to the boys, Applegate was bisexual, having previously been convicted of sodomy in 1953, and was then awaiting trial on charges of soliciting to commit sodomy.

Noticing that the apartment had only one bed and that the girls had failed to materialize, the boys became suspicious and turned to go. Applegate, told Scalessa "you're not leaving until I blow you."

Scalessa panicked. He punched Applegate in the jaw and fled, followed by Urella, Jr. In his haste to leave, Scalessa knocked over Funk, who was blocking the door.

Back at school, the boys told their friends and Brother Louis (a priest at LaSalle College) what happened, including the fact that Scalessa had punched Applegate. The next day, the incident was reported in the newspaper and the boys learned, to their horror, that Applegate was dead. Brother Louis immediately reported what had transpired to Brother Daniel Byrnian, the President of LaSalle College, who advised them to inform their fathers and the authorities. Urella, Jr. told his father who advised him to turn himself in.

Urella, Sr. also called Sprague. . . .

Sprague told Urella, Sr. to take the boys to the Police Department and notified the latter to expect their arrival. Urella, Jr. and Scalessa were placed in separate rooms, where Sprague advised them of their rights and then left. Sprague did not participate in their interrogation. Sprague's only involvement was to ask the police to administer polygraph examinations to Scalessa, Urella, Jr. and Funk in order to be certain that they were telling the truth. Sprague, was not a polygraph examiner, and did not perform the tests.

The Police Department conducted the investigation in their usual competent manner. Scalessa admitted to having punched Applegate and he had a bruised right knuckle to show for it.

The Police Department also sent notice of Applegate's death to the District Attorney's Office, as it always did when there was a homicide. It was rare for an Assistant District Attorney to be sent to a murder scene and none was sent this time.

The medical examiner came to the scene, together with an investigator from his office, as usual. He examined the scene and the body and had Applegate's body taken to the morgue for autopsy. His investigator interviewed Funk. The Medical Examiner, Dr. Campbell, concluded that Applegate's death was consistent with the one punch Scalessa admitted having thrown and so advised Sprague. Dr. Campbell found that Applegate had consumed nearly enough alcohol to have killed himself. Sprague did not visit the apartment nor did he see the body.

Thereafter, Sprague requested an Assistant District Attorney in the Homicide Unit to independently review the information which had been gathered and to give his assessment. Jack Myers (Myers), Assistant District Attorney reported back that the criminal prosecution was unwarranted. Neither Scalessa nor Urella, Jr. had done anything to Applegate that would warrant criminal action.

At that time, however, the charging function rested with the Police Department. The Police Department agreed that the arrests of Funk, Urella, Jr. would not be warranted and that Scalessa's punch was justified, but it did not want to assume responsibility for letting Scalessa go.

Detective Brooks, the homicide detective on the case, appeared before Judge Vignola at the preliminary hearing and provided a complete summary of the case. Sprague stated that in his view the punch was justifiable. Judge Vignola agreed. Accordingly, Judge Vignola dismissed all charges.

Judge Vignola had the authority to order the arrest of Urella, Jr. or Funk if he concluded from the evidence provided by the police investigation, that this was warranted. Significantly, he chose not to order their arrest. There were no police objections to the fact that the Court found that a prima facie case against Scalessa had not been presented.

Applegate had a police record for a homosexual convictions [sic]. *The Inquirer* was aware of this. In fact, Walter referred to Applegate as "the old Queen."

Walter had interviewed Funk but admitted he had altered the notes he took. This change resulted in having the article state that Urella, Jr. struck Applegate. Walter's intentional mischaracterization of the events created the inference that Urella, Jr. struck Applegate and Scalessa struck Funk. Walter knew that this was not the fact.

Trial Court Opinion of October 28, 1993 at 1–13 (citations omitted).

Thus, no evidence was adduced at trial which remotely demonstrated that Sprague improperly quashed the investigation in the Applegate case, or that he had committed any unethical or criminal act in the history of the wiretapping case. It wasn't until Sprague successfully prosecuted Walter for wiretapping that PNI and its reporters began to distort the facts of those two cases, the Applegate case and the police

wiretapping case, as a basis for the articles published on March 31 and April 1, 1973.

The events in the Applegate case had occurred ten years before in 1963. According to the evidence of record concerning the Applegate case, the matter had been handled with efficiency, impartiality and error-free assignments by the officials in charge. This included the police officers, the coroner, and the hearing magistrate who decided there was no justification under law or fact that either Urella, Jr. or Scalessa should be held under a charge of any degree of homicide.

The *Inquirer* articles and testimony of PNI witnesses emphasized the Sprague–Urella friendship as a strong basis for the accusation that Sprague purposely quashed homicide charges against Urella, Jr. as a favor to Rocko Urella, Sr. who at that time was an officer in the Pennsylvania State Police system. This evidence of the friendship between Sprague and Rocko Urella, Sr., both of whom held important public offices, disclosed nothing extraordinary about the friendship. But no matter how close the relationship between these two officials, it had no relevance whatsoever in view of the evidence of what occurred at the Applegate–Funk apartment. Viewing the facts as set forth above in their worst possible scenario, there was not a scintilla of evidence that would have justified or supported a charge of any degree of homicide against either Urella, Jr. or Scalessa. The only essential part Sprague personally became involved with was to order the polygraph tests of the two young men and Funk, Applegate's roommate. To draw a different picture of the Applegate case in the April 1, 1973 article, in a strained effort to implicate Sprague as one who had violated not only the law but his oath of office to uphold the law, was a demonstration of PNI's disregard for the truth, its awareness of the probable falsity of its publications, and a demonstration of actual and common law malice.

Edward J. Brooks, currently investigator for the Pennsylvania Supreme Court Office of Disciplinary Counsel, and assigned homicide detective at the time of the Applegate case, testified at trial. Mr. Brooks explained how a homicide file is prepared. He checked Applegate's records and found he had

a prior criminal record. Brooks then proceeded to the scene where he interviewed Funk, Applegate's roommate. Mr. Brooks testified that Sprague was a difficult man to work for. He wanted everything exactly right. Brooks said Sprague did not handle this case any differently than any other case.

## II. EVIDENTIARY CLAIMS

A. *Independent Appellate Review*

Before examining the issues which have been raised in this appeal, we will consider the entire record pursuant to our responsibility as an appellate court to conduct an "independent examination of the whole record." *Bose Corporation v. Consumers Union,* 466 U.S. at 499, 104 S.Ct. at 1958, 80 L.Ed.2d at 515, quoting *New York Times v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686, 709 (1964). The purpose of such review is to ensure "that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corporation, supra,* 466 U.S. at 515, 104 S.Ct. at 1958, 80 L.Ed.2d at 515. The standard of independent appellate review consists of the following:

> The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Id.* at 511, 104 S.Ct. at 1965, 80 L.Ed.2d at 523.

■ Actual malice in the case of a public official may be found if the plaintiff proves that the defamatory statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times v. Sullivan, supra,* 376 U.S. at 279–80, 84 S.Ct. at 725–26, 11 L.Ed.2d at 706 (1964). "The great principles of the Constitution which secure freedom of expression . . . preclude attaching adverse consequences to any except the knowing or reck-

less falsehood." *Garrison v. Louisiana,* 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125, 132 (1964). "[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Id.*

> Actual malice ... requires at a minimum that the [defamatory] statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," ... the defendant must have made the false publication with a "high degree of awareness of ... probable falsity," ... or must have "entertained serious doubts as to the truth of his publication."

*Harte–Hanks, Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 2686, 105 L.Ed.2d 562, 576–77 (1989). A publisher's subjective awareness of the "probable falsity" of a publication may be found if "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Herbert v. Lando,* 441 U.S. 153, 156–57, 99 S.Ct. 1635, 1639, 60 L.Ed.2d 115, 122 (1979), *quoting St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 268 (1968).

We have reviewed the evidence adduced at the 1990 trial of the instant case under the above standards. We hold that the evidence supports a finding of actual malice by clear and convincing proof. *Bose Corporation, supra,* 466 U.S. at 485, 104 S.Ct. at 1958. We note that the trial court has comprehensively reviewed the evidence at trial and has discussed in depth the requirement of actual malice in relation to that evidence. *See* Opinion of October 28, 1993, at 151–66. In his opinion, the trial judge addressed PNI's motion for judgment n.o.v., which was raised in post-trial motions, and determined that the evidence before the jury was clear and convincing that PNI published the March 31 and April 1 articles with actual malice. The judge reviewed the evidence presented at trial and discussed the falsity of the articles as well as the numerous circumstances of the case which evidenced PNI's reckless disregard for their falsity. The judge correctly concluded that the jury's verdict supported its award based on the evidence that the articles were false. He found the March 25 and 27 articles to be necessary background for the March

31 and April 1, 1973 articles, and that the later articles, were published with actual malice.

While we do not agree with all aspects of the trial judge's opinion, we do agree with the conclusions he reached on the actual malice issue. It is not necessary for us to duplicate the trial court's coverage of this issue for the following reasons. In post-trial motions, PNI requested judgment n.o.v., in which PNI raised, *inter alia*, the following issues:

1. The verdict was against the evidence.

2. The verdict was against the weight of the evidence.

3. The verdict was contrary to law.

. . . . .

6. As a matter of law, the record demonstrates no clear and convincing evidence of falsity of the publications in suit.

. . . . .

8. As a matter of law, the record demonstrates no clear and convincing evidence of actual malice.

Defendant's Post–Trial Motions, at 1–2. The lower court denied PNI's motion for judgment n.o.v. *See* Opinion of October 28, 1993, at 151–66. On appeal, PNI does not challenge the lower court's denial of its motion for judgment n.o.v.

Failure to raise an issue on appeal constitutes waiver of that issue. Pa.R.A.P., Rule 2116(a), 42 Pa.C.S.A. (no point will be considered on appeal which is not set forth in the statement of questions presented portion of the appellate brief). Since PNI does not challenge on appeal the trial court's denial of its motion for judgment n.o.v., it has waived that issue and all associated arguments on appeal. For these reasons, although we have conducted our own independent review of the record, we defer to the lower court's discussion of the evidence in relation to the issue of actual malice.

B. *Trial Court's Rulings on Evidence*

PNI requests a new trial to remedy the trial court's purported errors in its evidentiary rulings. Although Sprague

alleges that this claim was waived, PNI raised the issue of the trial court's evidentiary rulings in its post-trial motions, which the trial court denied. *See* Defendant's Post–Trial Motions, at 2–28. A trial court's disposition of a new trial motion will not be disturbed absent a manifest abuse of discretion or a clear error of law. *Nicholson v. Garris*, 418 Pa. 146, 210 A.2d 164 (1965); *McArthur v. Balas*, 402 Pa. 116, 166 A.2d 640 (1961). We will review PNI's contentions under these standards.

1. *Greg Walter's Medical Records and Deposition Testimony*

PNI contends that the trial court erred by admitting into evidence the medical and psychiatric records and deposition testimony of PNI reporter Greg Walter. That evidence consisted of Walter's deposition statements made on October 1 and 12, 1981, as well as records of his various hospitalizations and outpatient treatment for alcoholism, and for mental, emotional, and psychiatric illnesses. The records which were admitted at trial included: February 26, 1957 to May 15, 1957 (Pennsylvania Hospital); October 2, 1969 (University of Pennsylvania Hospital); September 8, 1970 to September 25, 1970 (University of Pennsylvania Hospital); November 10, 1971 to November 20, 1971 (University of Pennsylvania Hospital); June 23, 1972 to July 7, 1972 (Pennsylvania Hospital); outpatient records July 22, 1972 to April 3, 1973; and July 3, 1976 to July 20, 1976 (Northwestern Institute).

PNI bases its assertion that this evidence was improperly admitted on several grounds: (1) the evidence was not relevant to the issue of actual malice and was extremely prejudicial; (2) the evidence was not relevant because the events reflected in Walter's medical and psychiatric records were too far removed in time from the date of the published articles; (3) the records should not have been admitted because they were privileged and confidential; and (4) the records were inadmissible because there was no opportunity to cross-examine the individuals who offered their medical opinions and diagnoses in those records. We will address each of these considerations.

### a. *Relevance of the Evidence*

 PNI contends that Walter's records are not relevant to the issue of actual malice. Before addressing the substance of this claim, we will first consider Sprague's contentions that PNI waived its right to raise this issue. Sprague contends that, by failing to object at the deposition hearing to the relevance of Walter's testimony concerning his psychiatric treatment, PNI waived the right to object at trial to the admission of those records. Sprague bases his objections on *School District of Philadelphia v. Friedman,* 96 Pa.Commw. 267, 275 n. 1, 507 A.2d 882, 886 n. 1 (1986) and *Wenham Transportation, Inc. v. Radio Construction Co.,* 190 Pa.Super. 504, 509–09, 154 A.2d 301, 303 (1959). These cases do not support Sprague's position.

In *Friedman,* appellant made objections at trial to the admission of the videotape deposition testimony of an expert witness on the grounds that the testimony lacked proper foundation and that it could not qualify as expert testimony. *School District of Philadelphia v. Friedman,* 96 Pa.Commw. at 275 n. 1, 507 A.2d at 886 n. 1. The court found the objection to the witness' testimony waived under Pa.R.C.P., Rule 4016(b), 42 Pa.C.S.A. because both objections could have been made at the deposition and were not. *Id.* In *Wenham,* the objection was to the admission at trial of deposition testimony on the grounds that the testimony was not sworn. *Wenham Transportation, Inc. v. Radio Construction Co.,* 190 Pa.Super. at 508–09, 154 A.2d at 303. The court found no merit to this contention because there had been no objection made at the time of taking the deposition; thus, the error was considered waived. *Id.*

Under Rule 4016(b), objections to the competence, relevance, or materiality of testimony "are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which was known to the objecting party and which might have been obviated or removed if made at that time." Pa.R.C.P., Rule 4016(b), 42 Pa.C.S.A. A party may use the deposition of a witness for any purpose if the court finds that the witness is dead. *Id.,* Rule

4020(a)(3). Subject to the provisions of Rule 4016(b), "objection may be made at trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying." *Id.,* Rule 4020(c).

The relevancy objection which PNI asserted is unlike the objections which were raised in the cases cited by Sprague. Those cases involved objections which were capable of being cured at the time of deposition, *i.e.,* lack of proper foundation, failure to qualify as an expert, and failure to take deposition testimony under oath. In those cases, the objections were properly determined to have been waived because of the party's failure to assert them at the deposition.

Here, PNI's objection to the admission of Walter's deposition testimony and medical records [6] was to the relevance of that evidence to the very issues in the case. An objection to the relevance of this evidence could not have been obviated or removed if made at the time of deposition. *See* Pa.R.C.P., Rule 4016(b), *supra.* Therefore, PNI did not waive its right to raise the issue by failing to raise it at Walter's deposition.

Sprague also argues that PNI is precluded from raising the relevance of the evidence concerning Walter because PNI itself introduced evidence from Walter's records at trial. Sprague contends that principles of equitable estoppel apply to prevent PNI from using that evidence at trial, after having objected to the records' relevance. PNI contends that because the lower court denied its motion *in limine* prohibiting use of the records, it was then entitled to minimize the "damage" to its case accruing as a result of the admission of those records by using portions of the records to attempt to bolster its own case.

Sprague's position on this issue is without merit. PNI did not waive its right to object to the admission of Greg Walter's records and deposition testimony by its use of excerpts therefrom during trial. After the trial judge had denied PNI's motion *in limine* to exclude the evidence concerning Walter's

**6.** Walter died prior to the 1990 trial of this case.

psychiatric history, it was not necessary for PNI to renew that objection each time the evidence was used at trial. *Miller v. Peter J. Schmitt & Co., Inc.,* 405 Pa.Super. 502, 592 A.2d 1324 (1991), *appeal denied,* 529 Pa. 650, 602 A.2d 860 (1992); *Stern v. Vic Snyder, Inc.,* 325 Pa.Super. 423, 473 A.2d 139 (1984); McCormick, *Evidence* § 55, at 128–29 (2d ed. 1972). In addition, having suffered an adverse ruling on its motion *in limine,* the party who wished to exclude the evidence is entitled to "give answering evidence." *Id.,* § 57, at 132–33. "[C]ounsel who suffers an adverse ruling would be foolish if, after preserving his objection, he or she failed to attempt to discredit the testimony by cross-examination in the hope that he or she would be vindicated on appeal." *Stern v. Vic Snyder, Inc.,* 325 Pa.Super. at 435, 473 A.2d at 146. *See also Miller v. Peter J. Schmitt & Co., Inc.,* 405 Pa.Super. at 516, 592 A.2d at 1331 (because counsel for defendant was forced by the pretrial ruling to anticipate eventual admission of the objected-to evidence, defendant's own questioning did not "open the door" to the admission of such evidence).

In this case, counsel for PNI addressed portions of Greg Walter's medical records and deposition testimony in his cross-examination of the custodians of certain of those records. Counsel also addressed the subject during his examination of Eugene Roberts. PNI's defensive use of the evidence in this way did not constitute a waiver of its objection to the admissibility of the evidence. Having received an unfavorable ruling on its motion to exclude all such evidence, PNI was entitled to use that evidence to its best advantage in order to try to win the case, and not be forced to wait for possible vindication of the trial court's adverse ruling.

We now turn to the substance of PNI's claim of irrelevancy of Walter's medical history to the issue of actual malice. As we have stated previously, actual malice in the case of a public official consists of proof that the defendant made the defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–726, 11 L.Ed.2d at 706 (1964). The phrase "actual malice" is confus-

ing in that it has nothing to do with bad motive or ill will. *Harte–Hanks, Inc. v. Connaughton, supra,* 491 U.S. 657, 109 S.Ct. 2678. However, a libel plaintiff "is entitled to prove the defendant's state of mind through circumstantial evidence, . . . and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Id.* 491 U.S. at 657, 109 S.Ct. at 2686, 105 L.Ed.2d at 576–77. Under some circumstances, the probative value of ill-will evidence to establish actual malice may outweigh "the risk that admitting such evidence will chill honestly believed speech." *Tavoulareas v. Piro,* 817 F.2d 762, 795 (D.C.Cir.1987), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). The decision to admit such evidence must be made on a case-by-case basis, "bearing in mind that evidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith." *Id.*

Any competent evidence can be used to establish actual malice. *Herbert v. Lando,* 441 U.S. 153, 164 n. 12, 99 S.Ct. 1635, 1643 n. 12, 60 L.Ed.2d 115, 126 n. 12 (1979). "All the relevant circumstances surrounding the transaction may be shown," including, *inter alia,* "ill will or hostility between the parties." *Id. See also Tavoulareas v. Piro,* 817 F.2d at 789 (a libel plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence).

To establish that a libel defendant "recklessly disregarded" the falsity of its publication(s), "there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

> A defendant in a defamation action brought by a public official cannot . . . insure a favorable verdict by testifying that he published with a belief that his statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith are unlikely to prove persuasive . . . where a story is fabricated by the defendant. . . . Likewise, recklessness

36

may be found where there are obvious reasons to doubt the veracity of the informant of the accuracy of his report. *Id.* at 731–32, 88 S.Ct. at 1326, 20 L.Ed.2d at 267–68.

■ As to PNI's claim that Walter's medical history is irrelevant to the issue of actual malice, our standard of review of a claim that evidence is inadmissible because it is not relevant is as follows. Questions concerning the relevancy of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. *Williams v. Otis Elevator,* 409 Pa.Super. 486, 598 A.2d 302 (1991). "Evidence is relevant if it tends to make a fact at issue more or less probable." *Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983). "Relevance is a threshold consideration in determining admissibility of evidence." *Whyte v. Robinson,* 421 Pa.Super. 33, 38, 617 A.2d 380, 383 (1992).

■ It is true that Walter's hospital records concerning his mental and psychiatric stress, standing alone, and on grounds of privacy, would perhaps be inadmissible at this trial. However, his records were no longer private nor entitled to the rules of privacy regarding medical records. PNI knew about Walter's drinking and hospital records before Walter wrote the articles at issue. The *Philadelphia Bulletin* had fired Walter for his drinking and instability. PNI wrote articles and editorials covering this episode, and yet, shortly thereafter PNI hired Walter as one of its reporters. With this background and information, PNI subsequent to hiring Walter, knew of Walter's conviction for the crime of illegal wiretapping in the case which Mr. Sprague was the prosecutor. PNI knew that Walter admitted at his deposition hearing to his hospitalization for mental and emotional instability. This was evidence that required PNI to look into Walter's history of mental instability. PNI knew that Walter made numerous threats of harm to Sprague's outstanding public record because he blamed Sprague for his conviction. PNI had received a letter from Mr. Sprague addressed to Eugene Roberts, Executive Editor, in which was set forth a list of people

who would testify to Walter's numerous threats against Sprague. This list of people was never mentioned in the April 1, 1973 article. This too was additional information sufficient to put PNI on notice that Walter's work required special monitoring.

In light of this revelation concerning Walter, it can only be viewed as reckless failure on the part of PNI not to investigate the truth or falsity of the contents of the March 31 and April 1 articles. It was extremely shocking to find in the record that Mr. Roberts testified that he talked constantly with his reporters including Walter about the March 31 and April 1 articles, but he never followed up with any investigation or inquiry into information relating to the reliability of the informer or the credibility of the source of his information, which was his responsibility as managing editor. In this vein, it was also shocking to learn that Mr. Roberts testified he published the April 1, 1973 article on the basis of information he received from two attorneys whom he sent to investigate the persons whose names were set forth in Sprague's letter. However, one of the two attorneys, Samuel Klein, Esq., testified he never sent any information to Mr. Roberts concerning the persons named by Sprague until after the April 1, 1973 article was written. Mr. Roberts testified that he lost the anonymous letter sent to him concerning Walter's background. Lost also were the purported telephone conversations and tape recording between Walter and Funk.

In the instant case, there was substantial evidence of PNI's reckless disregard of the truth of the March 31 and April 1 articles. PNI's knowledge of Walter's threats to harm Sprague's reputation, the names of persons who had heard of Walter's threats furnished to Eugene Roberts, Executive Editor of the *Inquirer*, Walter's history of emotional and mental instability, together with the fact that the article of April 1, 1973, written before Mr. Roberts had sufficient assurance as to its truth, justified the jury's finding that the articles of March 31 and April 1, 1973, were written with malicious intent.

Other evidence of PNI's reckless disregard of the falsity of the articles included, *inter alia:* (1) the rewriting of a crucial sentence in the March 31 article, resulting in placing Sprague in a false and defamatory light in that news report; (2) the numerous false and unsupportable statements and omissions in the April 1 article, including the omission that Applegate was known to be a homosexual; (3) evidence that Walter "selectively reported" the information he received from Funk[7]; (4) the "loss" by PNI of numerous other items of important evidence, such as the tape of Walter's interview with Funk, and the anonymous letter concerning Walter; (5) that prior to the March 25 article, both the *Inquirer* and the *Bulletin* had identified "Pratko" as Metro Kardash; (6) reporter Shapiro's admission that the March 27 article did not make clear that Sergeant Hunt was not testifying that he himself believed that Sprague was Pratko; (7) Walter and Pollock's insistence on questioning Sprague about the 1963 Applegate case in March 1973 when they knew that Sprague was in Erie, Pennsylvania prosecuting William Prater for the Yablonski murders; (8) the lack of any evidence to support the *Inquirer's* theory that Sprague mishandled the Applegate case; and (9) Walter's admission that he had altered the notes he took in his interview of Funk; (10) Walter's serious threats to "get Sprague"; (11) the medical/psychiatric problems of Walter which bolstered his incentive for vindication.

PNI contends, however, that the use of Walter's medical records to establish Sprague's theory of actual malice was inappropriate because it was necessary for Sprague to produce expert testimony to support this theory. The use of expert testimony is necessary "when the subject matter of the inquiry is one involving special skills and training not common to the ordinary lay person." *Storm v. Golden,* 371 Pa.Super. 368, 376, 538 A.2d 61, 64 (1988), *appeal denied,* 524 Pa. 630, 574 A.2d 71 (1989). When the facts of the case are matters of common knowledge and within the range of ordinary experience, expert testimony is not required. *See Reardon v. Meehan,* 424 Pa. 460, 227 A.2d 667 (1967) (expert witness is

7. *See Sprague I,* 357 Pa.Super. at 606, 516 A.2d at 725.

confined to technical knowledge beyond that of the average man); *Collins v. Zediker*, 421 Pa. 52, 218 A.2d 776 (1966) (phenomena and situations which are matters of common knowledge may not be made the subject for expert testimony); *Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215 (1987), *appeal denied*, 518 Pa. 627, 541 A.2d 1138 (1988) (expert testimony inadmissible when the matter can be evaluated by the jury without the assistance of one claiming special knowledge on the subject).

It is within the knowledge and experience of the average juror to understand that the mental instability of anyone who has been hospitalized for mental problems may affect that person's judgment and rationality. Walter's hospital records, marking his mental and emotional travail, presenting as it did that slender delineating line between rational/irrational behavior, such as his revenge against a prosecuting district attorney, was behavior which the jury had the right to consider. In this case, the lower court's failure to require expert testimony was not error.

### b. *Prejudicial Nature of the Evidence*

PNI next contends that the lower court erred in admitting Walter's records and deposition testimony because that evidence was prejudicial. PNI argues that the prejudicial nature of the evidence outweighed its probative value and that the trial court should therefore have excluded it.

The trial judge has broad discretion regarding the admission of potentially misleading or confusing evidence. *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584 (1984). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. *Whistler Sportswear, Inc. v. Rullo*, 289 Pa.Super. 230, 433 A.2d 40 (1981). "The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value, and it is not for an appellate court to usurp that function." *Engle v. West Penn Power Co.*, 409 Pa.Super. 462, 484, 598 A.2d 290, 301 (1991),

*appeal denied,* 529 Pa. 669, 605 A.2d 334 (1992) (citation omitted). "Prejudice," for purposes of this rule, does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis. *Id.* Where evidence is alleged to be prejudicial, but is actually quite relevant to one of the inquiries in the case, it has been held that the probative value of the evidence exceeds its prejudicial nature, and the evidence is determined to be properly admitted. *See, e.g., Engle v. West Penn Power Co., supra,* 409 Pa.Super. 462, 598 A.2d 290; *Scullion v. EMECO Indus., Inc.,* 398 Pa.Super. 294, 580 A.2d 1356 (1990), *appeal denied,* 527 Pa. 625, 592 A.2d 45 (1991).

In *Scullion,* plaintiff/appellee brought an action against appellant for breach of an employment contract. The jury awarded appellee $40,000.00 in damages after a verdict in his favor. On appeal, one of the issues which appellant raised was that the trial court erred in allowing appellee to testify at trial that one of appellant's employees, Eugene Roscoe, had a drinking problem. Appellant argued that such evidence was irrelevant to the issues before the court and prejudicial to its case. *Id.* 398 Pa.Super. at 301, 580 A.2d at 1360. A panel of this court found that the trial court did not abuse its discretion in admitting the evidence. The panel affirmed the trial court's finding that the evidence was relevant because

the evidence of Roscoe's alleged alcohol problem supports Plaintiff's contention that the company owner was dissatisfied with Roscoe and was therefore interested in replacing him. Plaintiff testified that he was hired to replace Roscoe. However, upon reporting to work . . ., Plaintiff testified that he was told to bide his time until an alternative arrangement could be worked out for Roscoe. The evidence that Roscoe was to be replaced, but was still present when Plaintiff was hired and subsequently fired is essential to Plaintiff's contention that he was never given a chance to perform and was not dismissed for cause.

*Id.* The panel also rejected the appellant's contention that the evidence of Roscoe's drinking was too prejudicial to allow its admission, reasoning as follows:

we disagree with appellant's characterization of a drinking problem as a "reprehensible, even immoral and sinful condition" which would unduly influence the jury to render a decision on an improper basis. Appellee testified that the owner and president of Emeco informed him that Mr. Roscoe was being let go for several reasons: a "suspected drinking problem;" overspending of company funds on development of a new product which "never got off the ground;" lack of an increase in sales over the previous few years; and a lack of hard work on the part of Mr. Roscoe. *In light of the context in which the evidence was introduced* and the qualification of the drinking problem as "suspected," we cannot agree that this evidence has an " 'undue tendency to suggest decision on an improper basis.' " The trial court did not err in concluding that the evidence was admissible.

*Id.* at 301–02, 580 A.2d at 1360 (emphasis added). *See Engle v. West Penn Power Co., supra,* 409 Pa.Super. 462, 598 A.2d 290; *Daset Mining Corp. v. Industrial Fuels Corp., supra,* 326 Pa.Super. 14, 473 A.2d 584.

 In a similar fashion, the context of the present case was such that the trial court did not abuse its discretion in admitting the evidence of Greg Walter's medical/psychiatric history. The evidence here was introduced, not in isolation, but in combination with other evidence, as we have discussed above. For these reasons, the evidence at issue was not prejudicial in the context of this case.

c. *Remoteness of the Evidence*

 PNI's next contention is that the medical records of Greg Walter were inadmissible because of their remoteness in time to the publication dates of the defamatory articles. We disagree with this determination. The remoteness of evidence "is not determinable by distance and time alone, but . . . depends upon the facts in each case. No exact limitation of distance or time can be fixed." *Finnerty v. Darby,* 391 Pa. 300, 316, 138 A.2d 117, 125 (1958). "The question of remoteness, which is basically one of relevance, is properly vested in the discretion of the trial court, and its decision thereon will not be reversed unless a clear abuse of discretion is shown."

42

*Tolentino v. Bailey,* 230 Pa.Super. 8, 13, 326 A.2d 920, 922 (1974).

In the instant case, Greg Walter's medical records for the following time periods were admitted: February 26, 1957 to May 15, 1957 (Pennsylvania Hospital); October 2, 1969 (University of Pennsylvania Hospital); September 8, 1970 to September 25, 1970 (University of Pennsylvania Hospital); November 10, 1971 to November 20, 1971 (University of Pennsylvania Hospital); June 23, 1972 to July 7, 1972 (Pennsylvania Hospital); outpatient records, July 22, 1972 to April 3, 1973; and July 3, 1976 to July 20, 1976 (Northwestern Institute). The records were offered to show a long, continuous history of psychiatric treatment and hospitalization, as opposed to a single, isolated instance. It was not an abuse of discretion to admit these records which were already known to PNI before publication of the involved articles as probative of this point. For these reasons, it was not an abuse of discretion for the trial court to have admitted these records.

### d. *Confidentiality of the Records*

Next, PNI contends that Walter's records should not have been admitted into evidence at trial because they were the subject of evidentiary privileges related to the confidentiality of medical records and records of psychiatric treatment. PNI has cited various statutory provisions in support of this argument, *i.e.,* 50 P.S. § 7111 (all documents concerning persons receiving or having received treatment under the provisions of the Mental Health Procedures Act shall be kept confidential and not disclosed without the person's written consent); 71 P.S. § 1690.108(b) (all patient records prepared or obtained under the Drug and Alcohol Abuse Control Act are confidential and may be disclosed only with the patient's consent); and 42 Pa.C.S.A. § 5944 (Purdon Supp.1994) (no psychiatrist or licensed psychologist shall be examined in any civil or criminal matter as to any information acquired in the course of his professional services on behalf of the client). *See also Commonwealth v. Eck,* 413 Pa.Super. 538, 605 A.2d 1248 (1992) (psychotherapist/patient privilege of 42 Pa.C.S.A.

§ 5944 applies not only to testimony of psychotherapist, but also to records created in the course of the confidential relationships).

But, unfortunately for PNI, the above situations do not apply in this case. PNI's claim would have merit if we were concerned with an isolated situation where the sole issue was the confidentiality of a person's hospital records. Here there is more to this case than just that question.

■ In this case, the record shows that Walter's medical records and records of psychiatric treatment were released in 1972 to the coroner's office in Philadelphia County. That release became the subject of news stories in both the *Inquirer* and the *Bulletin*. In connection with those stories, Walter was interviewed and admitted that he had received psychiatric evaluation. This admission by Walter was published in the news reports. The right to claim a privilege is a personal one belonging to the individual protected by the statutory privilege. *See Commonwealth ex rel. Romanowicz v. Romanowicz*, 213 Pa.Super. 382, 248 A.2d 238 (1968).

The record also reveals that at about the same time that Walter's records came into the possession of the coroner's office, information about Walter's medical/psychiatric treatment was made available to the *Inquirer*, as well as to various public officials, by an undisclosed anonymous source. Furthermore, the record demonstrates that in 1981, Walter testified at a discovery deposition related to the instant case, about the various medical/psychiatric treatments he had received from the age of ten through 1979. While testifying about these treatments, Walter did not assert any privilege of confidentiality.

■ A privilege of non-disclosure must be asserted during a discovery proceeding or it will be waived. *Commonwealth v. Kauffman*, 413 Pa.Super. 527, 605 A.2d 1243 (1992). It has been held, in regard to the attorney-client privilege, that a party waived certain confidential communications between herself and her attorney when she answered depositions on the subject. *Naglak v. Pennsylvania State University*, 133

44

F.R.D. 18 (M.D.Pa.1990) (applying Pennsylvania law). In the instant case, PNI claims that Walter did not assert a privilege of non-disclosure at his deposition because he testified only as to basic general information about his treatment. However, the record shows that Walter testified at some length during his deposition about many of the details of his treatment, including dates of treatment, reasons for seeking it, physicians seen, and diagnoses made. Much of the information from Walter's treatment records which was read into the record at trial was discussed by Walter during his deposition without objection. This public information was a rational and admissible source for the jury to consider in determining the harm caused to plaintiff's reputation which was brought about by the emotional and mental stress under which Walter wrote his articles underlying his hatred for the plaintiff and the plaintiff's prosecution of him for wiretapping. This was a proper case for the admission of certain of Walter's confidential medical records which the court ordered. 55 Pa.Code § 5100.35(b).

In view of the overwhelming public knowledge regarding hospitalizations and personal disclosure by Walter in public and at the depositions and in newspaper articles, the hospital records themselves could not in any way have negated the public notice of Walter's problems. As was said in *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988), *aff'd*, *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), "[A] thing remains secret until it is told to other ears, after which one cannot command its keeping." *Id.* 519 Pa. at 464, 549 A.2d at 87. It is beyond argument that Walter's mental and emotional problems had become so familiar in the public domain that the additional notice of certain of his medical records had no impact and was harmless evidence in this case.

e. *Medical Opinion in the Records*

PNI's next contention on appeal is that Walter's medical and psychiatric records should not have been admitted in evidence because those records contained numerous profes-

sional diagnoses and opinions which were not subject to cross-examination. Sprague claims that PNI waived this argument at trial. However, the record reveals that PNI did raise this issue in its motion in "Opposition to Plaintiff's Proposal that he be Permitted to Reveal Portions of Greg Walter's Medical Records to Jurors and a Psychiatric Expert."

Opinion evidence contained in hospital records is inadmissible where the physician who authored those records is unavailable for cross-examination. *Williams v. McClain*, 513 Pa. 300, 520 A.2d 1374 (1987). The medical diagnosis of a licensed physician contained in hospital records is evidence of this type. *Id.* However, under the business records exception to the hearsay rule, hospital records of a patient are admissible to show the fact of hospitalization, treatment prescribed, and the symptoms found. *Id.; Commonwealth v. DiGiacomo*, 463 Pa. 449, 345 A.2d 605 (1975); *Morris v. Moss*, 290 Pa.Super. 587, 435 A.2d 184 (1981).

In *Williams v. McClain, supra*, 513 Pa. 300, 520 A.2d 1374, the trial court, in a medical malpractice action alleging negligence in the performance of operations on plaintiff's (appellant's) hip, the trial court admitted the report of a hospital social worker without the benefit of cross-examination. In one section of the report, the social worker stated, "[Appellant] revealed instability and frustration when discussing her environmental circumstances which must contribute to much aggravating stress for the patient, possibly aggravating the existing physical problem." *Williams v. McClain*, 513 Pa. at 304, 520 A.2d at 1375–76. The Pennsylvania Supreme Court found that the social worker's report contained inadmissible opinion evidence, and that the admission of this evidence was not harmless but constituted reversible error. The court reasoned as follows:

> Not all trial errors rise to the level of reversible error. An erroneous ruling must also be harmful to the complaining party before reversal is required. *Anderson v. Hughes*, 417 Pa. 87, 208 A.2d 789, 791 (1965). Upon a proper consideration of the record we hold that the social worker's report related to the liability issue of causation, as well as damages, and so was harmful to Williams. To prove her

case Williams had to show that McClain's negligence was the proximate cause of her injuries. Based on the social worker's opinion, it is possible that the jury found that these injuries would have existed with or without negligence on the part of McClain.

*Id.* 513 Pa. at 308, 520 A.2d at 1378 (citations omitted).

In the instant case, Walter's medical records were admitted not for the diagnoses contained therein, but as evidence of the fact of Walter's hospitalizations, the treatments he received, and the symptoms leading to his hospitalizations. To the extent that the medical diagnoses were admitted, this was harmless error. Unlike the facts in *Williams v. McClain, supra,* 300, 520 A.2d 1374, the opinion evidence contained in the medical records in this case was not necessary to prove the fact of the hospitalization. Therefore, admission of the records without cross-examination by the treating physician(s) was not reversible error.

### f. *Admission of the Records and the First Amendment*

 PNI asserts that by admitting the medical reports and testimony of Greg Walter, the lower court "eviscerated PNI's core first amendment freedoms." Brief for appellant, at 39. Here PNI merely chooses to ignore the contending forces of freedom of the press and the right to privacy. Under the facts of this case, PNI's First Amendment freedom crossed the line into the domain of a person's right not to be falsely defamed.

### 2. *Trial Court Rulings Excluding Evidence*

### a. *Affidavit of Jacqueline Sprague*

 PNI next asserts that the lower court erred by excluding "highly probative evidence of PNI's belief in the truth of the articles at the time of publication." As we have previously stated, rulings on evidence are within the sound discretion of the trial court, and will not be reversed on appeal absent a manifest abuse of that discretion. *Capan v. Divine Providence Hospital,* 270 Pa.Super. 127, 410 A.2d 1282 (1979).

The first piece of evidence which PNI contends was improperly excluded is portions of the affidavit of Jacqueline Sprague, former wife of Richard Sprague. PNI argues that it was error to exclude this evidence because it showed that PNI had strong reason to believe that Sprague and Urella, Sr. were close personal friends in 1963, which, PNI argues, was a critical issue at trial. The affidavit of Mrs. Sprague was assembled by Greg Walter in 1973.

At trial, PNI sought to admit the entire affidavit into evidence. The trial court denied this request. Earlier in the trial, the lower court had permitted Sprague to use portions of the affidavit (paragraphs 7, 8, 9, 10, and 11) in its cross-examination of Eugene Roberts. PNI stated that it sought to introduce the affidavit to show information available to reporter Kent Pollock prior to publication of the articles in question. In its brief on appeal, PNI asserts that it was error for the trial court to refuse to allow admission of paragraphs two and three of the affidavit. Those paragraphs provide:

(2) During the years we [Richard Sprague and Jacqueline Sprague] lived together as man and wife, we had many friends, including a number of persons in the press. Dick (Richard A. Sprague), incidentally, was extremely close to Harry Karafin, then an Inquirer reporter, as well as Burton Chardak and Joe Daughen of The Bulletin. In late 1960, we got friendly with Rocco P. Urella and his wife. We had dinner with the Urellas, sometimes at their home in Ardmore (Pa.) and sometimes at restaurants.

(3) As a matter of fact, it was to Mr. Urella that I turned for help, among other people, when Dick began his affair with Mrs. Edith Magaziner. I thought Urella could speak to Dick about the propriety of his having a quite open affair with this woman while holding an important position with the District Attorney's office.

*See* affidavit of Jacqueline Sprague.

PNI contends that the affidavit should have been admitted because it was relevant to show PNI's state of mind at the time of publication of the articles in question, and thus went to

the issue of whether PNI published the articles with actual malice. PNI sought to prove by this evidence that the reporters, based on their conversations with Mrs. Sprague, believed that Richard Sprague and Urella, Sr. were in fact good friends in 1963. Thus, PNI sought to prove by the affidavit that any false statements in the April 1, 1973 Applegate homicide article were not published with knowledge of their falsity or with reckless disregard of the truth of those statements. PNI contends that where the state of mind of a publisher is at issue in a defamation case, evidence which would otherwise be considered hearsay may in fact be admitted as probative of the defendant's state of mind.

The definition of hearsay is well known:

Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.

McCormick, *Evidence* § 246, at 584 (2d Ed.1972).

The affidavit which PNI sought to admit was offered to prove that Jacqueline Sprague told the reporters (Walter and Pollock) certain information about herself, Richard Sprague, and Urella, Sr. Thus, the affidavit constitutes an out-of-court statement by Jacqueline Sprague to the reporters which PNI offered to show or prove that she had in fact told the reporters certain important information about Sprague and Urella. Despite PNI's contentions to the contrary, the affidavit was hearsay. PNI offered it as an assertion of the truth of the matter asserted therein: that Jacqueline Sprague told Walter and Pollock that Richard Sprague and Urella were friends, at least by late 1960. The declarant was Jacqueline Sprague. The statement was directed to Walter and Pollock. Walter was unavailable because of his death. Pollock was available at trial and in fact did testify. Pollock's testimony included evidence about what Jacqueline Sprague had told him.

Although counsel may put in evidence as it desires, it may not put in hearsay evidence which does not fit within any of

the exceptions to the hearsay rule. If PNI wanted to "bolster" Pollock's testimony by submitting other evidence of the information which Pollock possessed, PNI could have called Jacqueline Sprague as a witness. She could have personally testified as to what she told Pollock and Sprague about the entries in her diary. The trial court was not required to accept the affidavit when the declarant was available and the matters sought to be demonstrated could have been proved in court subject to cross-examination.

### b. *Eugene Roberts' Testimony*

 PNI contends that the trial court erred when it sustained Sprague's objection to questioning by PNI of Roberts to elicit Roberts' personal experience with "selective prosecution of reporters to silence the press and achieve political goals." As we have previously stated, rulings on evidence are within the sound discretion of the trial court and will not be reversed on appeal absent a clear or manifest abuse of that discretion. *American States Insurance Co. v. Maryland Casualty Company*, 427 Pa.Super. 170, 628 A.2d 880 (1993). A trial court has wide discretion in ruling on the relevancy of evidence, and its rulings will not be reversed absent an abuse of discretion. *Plowman v. Plowman*, 409 Pa.Super. 143, 597 A.2d 701 (1991).

The trial court ruled as follows on the issue:

Roberts was to testify as to "having seen reporters get arrested on what *he felt were* trumped up charges in the south." From this, Roberts attempts to testify how that experience shaped his opinion; i.e. Roberts had the right to assume that the 1973 wiretapping charge against Walter was "trumped up." There is no comparison. Walter's arrest was based on fact. Whatever the events were in the South, as to those reporters, is pure speculation and guess work. . . .

An individual does not have the right to determine which crimes we can accept and which crimes we can reject. Carried to a normal conclusion, government by rule of law

would be abolished. To hold otherwise would create a lawless society....

To permit this line of questions would present to the jury the concept that some laws may be obeyed while others are unjust and could be ignored. The issues created by these line of questions are numerous and far removed from the issue of this case. In fact, it would confuse the jury and send a message that each person could decide for himself or herself whether they have an obligation to obey the laws of this Commonwealth.

Trial court opinion of October 28, 1993 at 46–48. We find no abuse of discretion in the trial court's ruling on this issue. PNI's question went beyond the scope of Sprague's cross-examination of Roberts, who was called by Sprague as a hostile witness. In light of all Roberts' testimony, we can conclude that his credibility was for the jury.

c. *Kent Pollock's Testimony*

PNI next contends that the trial court erred in sustaining Sprague's objection to PNI's question to reporter Kent Pollock concerning what information he received which led him to work on the April 1, 1973 article with Walter. We find no merit to this contention. "The exclusion of evidence is not grounds for the granting of a new trial if evidence of the same fact or facts was introduced by the party applying for a new trial." *Soda v. Baird,* 411 Pa.Super. 80, 86, 600 A.2d 1274, 1277 (1991), *appeal denied,* 532 Pa. 665, 616 A.2d 986 (1992). Although the trial court sustained Sprague's objection to the proffered testimony, Kent Pollock answered the substance of PNI's original question in response to a later question on direct examination. Thus, the evidence sought was in fact admitted and there is no basis for a determination of reversible error on this point.

■ In its next claim, PNI argues that the trial judge erred by refusing to compel Sprague to turn over copies of his tax returns to PNI. PNI contends that Sprague's income was relevant to his claim of loss of reputation. The trial court held that Sprague's tax returns were irrelevant because Sprague

was not seeking damages for economic loss, but for loss of reputation. We have reviewed the parties' briefs, as well as the certified record in this case and conclude that the opinion of the trial judge, dated October 28, 1993, thoroughly and correctly resolves this issue. Rather than repeat the analysis of the trial court, we hereby affirm on the basis of the trial court's opinion.

## III. JURY INSTRUCTIONS

PNI also alleges error in the trial court's charge to the jury. "In reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party." *Reilly by Reilly v. Southeastern Pennsylvania Transportation Authority*, 507 Pa. 204, 231, 489 A.2d 1291, 1305 (1985). "[A] trial judge has wide latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law." *Wilson v. Anderson*, 420 Pa.Super. 169, 173, 616 A.2d 34, 36 (1992).

A requested point for charge need only be read to the jury where the charge is supported by evidence of record. *Holland v. Zelnick*, 329 Pa.Super. 469, 473, 478 A.2d 885, 887 (1984). If the trial court adequately covers the substance of a requested point for charge in its instructions to the jury, the court may properly deny the requested point even though it correctly states the law. *Brill v. Systems Resources, Inc*, 405 Pa.Super. 603, 606, 592 A.2d 1377, 1378–79 (1991).

PNI's first claim of error concerning the jury charge is twofold and centers on the first two articles written about Sprague—those of March 25 and 27, 1973. The newspaper first alleges that the trial court erred by allowing the jury to base liability upon the articles published on March 25 and March 27, 1973 because in *Sprague I* this court determined those articles to be non-actionable. PNI argues that under

the "law of the case" doctrine, we must again find the two articles to be non-actionable and premise trial court error on the trial judge's failure to so instruct the jury. Secondly, PNI contends that the trial court erred by refusing to instruct the jury on the "fair report" privilege as that doctrine relates to the March 25 and 27, 1973 articles.

It is clear from the record that the trial judge did not instruct the jury that the law of the case doctrine precluded its determination of whether the March 25 and 27 articles defamed Sprague. Further the record also reveals that the trial judge did not instruct the jury on the fair report privilege as to the two articles. Regardless of the trial judge's actions, the law concerning the grant of a new trial based on erroneous jury instructions is clear. We may only reverse based on an erroneous jury charge if the error *controlled* the outcome of the case. *See Leaphart v. Whiting Corp,* 387 Pa.Super. 253, 260, 564 A.2d 165, 168 (1989), *appeal denied,* 525 Pa. 619, 577 A.2d 890 (1990) (to constitute reversible error, a jury instruction must not only be erroneous, but also harmful to the complaining party).

Even assuming, *arguendo,* that PNI's claims have merit, we find no prejudice which would warrant the grant of a new trial because these alleged errors did not prejudice PNI. The March 25 and 27 articles were squarely before the jury if for no other reason than to lay the foundation for the March 31 and April 1, 1973 articles, which PNI concedes could be found by the jury to have defamed Sprague. Thus, the jury had before it the substance of the two articles which first alleged that Sprague was the fictitious Pratko. Moreover, the March 31 article clearly implicated Sprague in wrongdoing. That article stated that "Sgt. Matthew Hunt said Sprague allegedly had used an alias in the registration of an unmarked car linked to the bugging incident." Thus, the heart of the Pratko libel was found not in the March 25 and 27 articles, but rather in the March 31 article. Further, the jury had before it overwhelming evidence concerning the defamation of Sprague based on his handling of the Applegate matter as set forth in the April 1, 1973 article. Sprague, himself admitted that the

crux of this case centered on the Applegate affair. We are confident, based on the evidence presented at this trial and by the fact that two juries have now concluded that PNI defamed Sprague, that the trial court's errors did not sway the jury's verdict.

Next, PNI argues that the trial court failed to adequately charge the jury on the Pennsylvania Shield law in accordance with our Supreme Court's decision in *Sprague I*. One of the issues which PNI raised to this Court in *Sprague I* was whether the trial court properly held that PNI had no right to refuse to disclose its sources of information used in the articles at issue. Upon failing to disclose the sources, the trial court precluded PNI's defense that the articles were based on information received from reliable sources. The trial court then excluded any information that the PNI received from undisclosed sources because PNI reporters invoked the Shield law at various instances throughout the trial. Based on these events, the trial judge instructed the jury to disregard all testimony of defense witnesses obtained from undisclosed sources and then listed the evidence to be disregarded.

On appeal to this Court, we held that the trial court erred by excluding relevant evidence concerning PNI's investigation because PNI reporters refused to disclose their sources under 42 Pa.C.S.A. § 5942. Based on this error, we awarded a new trial.

Our Supreme Court granted Sprague's petition for allowance of appeal and considered only the issue concerning the proper application of the Pennsylvania Shield Law. The Supreme Court affirmed the award of a new trial, holding that although reporters cannot be compelled to disclose the identity of their sources, there can be no inference, either positive or negative, as to the reliability of the undisclosed source or the accuracy of the information accessed. Thus the Court held that when instructing the jury, the trial judge

should make clear for the jury, (a) that the burden of proof remains upon the plaintiff throughout the trial; (b) that if the Shield Law is invoked by the defendant to avoid disclos-

ing a source, *no inference either favorable or adverse may be drawn from the act of invoking that privilege as to the reliability of the unidentified source or as to the accuracy of the information supplied;* and, (c) that the jury is to consider any evidence and/or arguments made by plaintiff and defendant as to the reliability of the undisclosed source and as to the accuracy of the information supplied.

*Sprague I,* 518 Pa. at 441–42, 543 A.2d at 1086 (emphasis in original).

Specifically, PNI contends that the trial judge failed to tell the jury not to draw any adverse inference from PNI reporters exercising their rights not to disclose confidential sources under the Shield law in accordance with subpart (b) of the Supreme Court's discussion of the jury charge. Mindful of our standard of review that the charge need not be in the exact language requested so long as the trial judge adequately conveys the appropriate law to the jury, we find that the trial judge charged the jury in substantial accordance with the Supreme Court's mandate in *Sprague I.* In accordance with part (b) of the Supreme Court's holding, the trial judge charged the jury as follows:

Ladies and gentlemen, you have heard defendant's contention that some portions of this article are based upon information received from confidential sources, that is from a person or persons to whom the reporter promised unanimity. I instruct you that under the so-called Shield Law of Pennsylvania reporters are protected against the forced disclosure of the identity of confidential sources. However, the privilege provided under the Shield Law was not intended to allow a media defendant to use any of its sources and information as proof of reliability of the information received or reliability of the source from which the information was received. You determine that. You determine the reliability of the source of information given, recognizing that it comes from an unknown source protected by the Shield Law. In other words, the invocation of the Shield Law does not establish an inference as to the reliability of

the unidentified source or as to the accuracy of the information supplied.

The Shield Law was privileged based on the Constitution and designed to encourage communication from even the most unsavory of sources and, therefore, you're not required to accept the truth of information just because that information was allegedly provided by a confidential source nor are you required to accept a credibility of source [sic] that supplied the information.

N.T. 5/2/90 at 69–70.

PNI argues that the trial judge should have told the jury that no adverse inference could be taken from invocation of the Shield Law. We decline to find such an error. The charge as given indicates that the trial judge informed the jury to draw no inference concerning the reliability of confidential sources from the invocation of the Shield Law. This is the crux of the Supreme Court's holding in *Sprague I*. *See Sprague I, supra,* (no inference either favorable or adverse may be drawn from the act of invoking that privilege as to the reliability of the unidentified source or as to the accuracy of the information supplied). In its opinion, the Supreme Court did not indicate a preference for adverse inferences over favorable ones. Similarly, here, the trial court's charge specifically omitted any reference to favorable or adverse inferences. Rather, the judge told the jury not to draw *any* inferences from invocation of the privilege. We therefore decline to find any error in the charge on this ground.

Furthermore, PNI also contends that the instruction describing the purpose of the Shield Law unfairly implied that PNI's sources were unsavory. We do not agree. The trial judge explained to the jury that the Shield Law was designed to encourage communication with even the most unsavory of sources. We find no error in this charge.

PNI claims a third error in the court's charge by alleging that the trial judge "effectively and erroneously directed a verdict against PNI on the issue of defamatory meaning." PNI charges that the trial court precluded the

jury's consideration of the April 1, 1973 article as legitimately expressing that Sprague engaged in a conflict of interest by involving himself in the investigation of the Applegate death. PNI points to the following instruction which the trial judge gave to the jury:

> You've heard a great deal of testimony in this case concerning the Applegate homicide. In determining whether the article of April the 1st, 1973, was false you need not decide who it was that actually struck Applegate. We're not trying that case. *All you need to decide is the truth or falsity of the claim that Mr. Sprague quashed or covered up the investigation into the death of John Applegate.* If you conclude from the evidence that Mr. Sprague didn't quash a homicide case as favor to Urella or that Mr. Sprague was not tied to the wiretap case, *then you may find this article of April 1st, 1973, was false.*

Brief of PNI at 29 (emphasis in original).

Thus, PNI claims that the trial judge prohibited the jury from considering whether PNI's article brought out that Sprague may have had a conflict of interest by handling the Applegate matter. We disagree. Mr. Sprague was Chief of Homicide in the Philadelphia District Attorney's Office. It was his duty to have an official part in this case. We find no conflict just because he happened to have a friend whose son was involved in a case. The April 1, 1973 article set forth that Sprague (1) improperly quashed the case despite evidence that Urella, Jr. hit Applegate, and (2) quashed the case as a favor to his close friend, Urella, Sr. The trial judge's charge to the jury not only directed the juror's attention to whether Sprague improperly quashed the appeal, but also whether Sprague quashed the appeal *as a favor* to Urella. Therefore, the issue of whether Sprague was engaged in a conflict of interest was squarely before the jury.

Moreover, the trial judge explained to the jury on numerous occasions that they were the sole finders of the facts and that his instructions should not be interpreted as directing the jury towards a certain verdict. N.T. 5/2/90 at 37, 47, 49, 59, 75. We therefore find that the jury was properly instructed that it

was the sole finder of fact and the trial judge did not improperly attempt to guide them to a specific verdict.

Lastly, PNI argues that the trial judge grossly misstated facts in his charge to the jury. We have reviewed the certified transcripts in this case and find no merit to this argument. The trial judge's factual statements are supported in the certified record.

Moreover, we cannot agree with PNI's assertion that the charge as a whole was fundamentally imbalanced. The trial judge instructed the jury on numerous occasions that its recollection of the facts controlled; that he [the trial judge] stated the facts to place the case into perspective and not to direct the jury's verdict; and, that the jury was the sole arbiter of the facts. Having reviewed each of PNI's claims concerning the trial judge's charge to the jury, we find no reversible error.

## IV. PUNITIVE DAMAGES

A. *Exclusion of the "Packel Report"*

PNI argues that the size of the punitive damage award was directly affected by the trial court's alleged error in excluding a document designated as the "Packel Report" from consideration by the jury. The thrust of this claim is that PNI was unable to adequately justify its "post-publication conduct" which it contends was actually grounded on the information contained in the "Packel Report." As a basic proposition, to be admissible, evidence must be both competent and relevant. *Taliferro v. Johns–Manville Corp.*, 421 Pa.Super. 204, 215, 617 A.2d 796, 802–03 (1992). Competent evidence is that which is relevant and material to the issues to be determined at trial. *See Black's Law Dictionary* 284 (6th ed. 1990). Evidence is relevant if it logically or reasonably tends to prove or disprove a material fact in issue, tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact. *Moran for and on Behalf of Estate of Moran v. G. & W.H. Corson, Inc.*, 402 Pa.Super.

101, 125–26, 586 A.2d 416, 428–29 (1991), *appeal denied,* 529 Pa. 650, 602 A.2d 860 (1992).

■■■ These, however, are only *threshold* considerations in determining the admissibility of evidence. *See Whyte v. Robinson,* 421 Pa.Super. 33, 38, 617 A.2d 380, 383 (1992). Even relevant evidence is not admissible if it is shown to come within a rule which makes it excludable. *Hatfield v. Continental Imports, Inc.,* 530 Pa. 551, 557, 610 A.2d 446, 449 (1992). Furthermore, the trial court may properly preclude any evidence whenever its probative value is substantially outweighed by the danger of unfair prejudice, or if the trial judge determines that the evidence may confuse the issues or mislead the jury. *Daset Mining Corporation v. Industrial Fuels Corporation,* 326 Pa.Super. 14, 22, 473 A.2d 584, 588 (1984). "Prejudice" for the purposes of this standard means "an undue tendency to suggest a decision on an improper basis". *Whyte v. Robinson,* 421 Pa.Super. at 38–39, 617 A.2d at 383.

■■■ The trial court explained its decision to exclude the "Packel Report" in the following manner:

Israel Packel (Packel), Attorney General of Pennsylvania in 1973, issued a report, composed by John J. Purcell (Purcell), an investigator in the Justice Department, on the [Applegate] murder investigation. PNI attempted to introduce this report, together with its' cover letter, into evidence. Sprague's objection to the admission of the report was sustained.

In 1972, Packel requested the District Attorney's Applegate homicide file from the District Attorney. Packel assigned Purcell to make an investigation.

[PNI first argues] that under the "Uniform Business Records as Evidence Act" the report is admissible. The Act holds that:

A record of an act, condition or event shall insofar as relevant, be competent evidence if the custodial or other qualified witness testifies the custodian or other qualified witness testifies to its identity and the mode of its course

of business at or near the time of the act, condition or event, and if in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S.A. § 6108. [The "Packel Report"] was prepared more than a decade after the incident. In addition, there were no facts presented from which we can assume that this report was made in the "regular course of business." In fact, the preparation of this report was the exception, rather than the rule. Obviously, it was not prepared "at or near the time of the act, condition or event[.]" Consequently, the cited authority clearly and succinctly precludes the admission of this report into evidence.

Trial court opinion dated October 28, 1993 at 24–25 (case citations omitted).

The lower court also noted that the "Packel Report" must be deemed hearsay because it consisted of a document prepared by a person who was not called to testify as a witness. As the Pennsylvania Supreme Court has stated:

The primary object of a trial in American courts is to bring to the tribunal, which is passing on the dispute involved, those persons who know of their own knowledge the facts to which they testify.... Accordingly, nothing is more adamantly established in American trial procedure than that no one may testify to what somebody else told him. He may only relate what is within the sphere of his own memory brought to him by the couriers of his own senses.

*Semieraro v. Commonwealth Utility Equipment Corporation,* 518 Pa. 454, 457, 544 A.2d 46, 47 (1988) (quoting *Johnson v. Peoples Cab Company,* 386 Pa. 513, 514–15, 126 A.2d 720, 721 (1956)). In *Johnson,* the trial court had admitted into evidence a police accident report prepared by an officer who did not arrive at the scene of a collision until five or ten minutes after it occurred. The Supreme Court held that this constituted prejudicial error. First, the police report was hearsay because the officer could not say of his own perception the exact sequence of events which caused the accident. Second, the jury would have been bound to ascribe undue weight to

the document because it was presented with all the prestige and authoritativeness naturally accruing to the product of an official government source. 386 Pa. at 515–16, 126 A.2d at 720.

Citing to *Johnson*, the trial court in the instant case explained the following:

> The report submitted by Purcell contained excerpts of the Philadelphia Police Department's investigation. This investigation mainly consisted of statements by alleged witnesses, PNI's attorneys and others. At best, this document was a compilation of hearsay upon hearsay, innuendos, unsubstantiated statements of opinions and the author's unsupported conclusions, rather than an independent investigation.

Trial court opinion at 26 (citations omitted). In consideration of these facts, the trial judge explicitly determined that the "Packel Report" was not only hearsay, but had little probative value and would alter the focus of the jury's attentions. Further, because the "Packel Report" would carry with it the authority and prestige of the Office of the Attorney General of the Commonwealth of Pennsylvania, it would create the danger of confusing and misleading the jury into according it too much weight. The lower court therefore declined to admit the report. *Id.* at 27.

Our standard of review for evidentiary rulings by a trial judge is very narrow. *Gemini Equipment v. Pennsy Supply*, 407 Pa.Super. 404, 413, 595 A.2d 1211, 1215 (1991). In general, we may reverse only for an abuse of discretion or error of law. *Id.* The exclusion of evidence which is irrelevant, confusing, misleading, cumulative or prejudicial is within the sound discretion of the trial court and its decision thereon will not be disturbed lightly. *Concorde Investments, Inc. v. Gallagher*, 345 Pa.Super. 49, 56, 497 A.2d 637, 641 (1985). *Accord Commonwealth v. Wallace*, 522 Pa. 297, 309 n. 15, 561 A.2d 719, 725 n. 15 (1989) (admissibility of evidence is left to the sound discretion of the trial court; an appellate court may reverse only upon a showing that the trial court abused its discretion).

PNI has provided an extensive discussion of the alleged relevance and materiality of the "Packel Report," as well as a detailed explanation of the purposes for which the document would have been used and the manner in which the report's exclusion purportedly prejudiced the defense. However, PNI has utterly failed to address the crux of the trial court's ruling: that the "Packel Report" had little probative value in relation to the high probability that it would confuse and mislead the jury. Under these circumstances, we find no basis upon which we can conclude that the trial court committed either an abuse of discretion or an error of law in excluding this evidence.

B. *Stipulated Evidence of PNI's Net Worth*

Next, PNI argues that the trial court erred in permitting Mr. Sprague to introduce evidence concerning PNI's net worth. It is well-settled that when punitive damages are at issue in a case, the jury must consider not only the character of the act underlying the claim and the harm suffered by the plaintiff, but also the wealth of the defendant. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 102, 555 A.2d 800, 803 (1989) (citing Restatement (Second) of Torts § 908(2)). *Accord Feld v. Merriam*, 506 Pa. 383, 396, 485 A.2d 742, 748 (1984). The certified record is quite clear that Mr. Sprague sought punitive damages in this case. Therefore the trial court committed neither an abuse of discretion nor an error of law in permitting Mr. Sprague to introduce evidence regarding PNI's wealth. We find no legal difficulty in upholding the trial court's decision to treat PNI's net worth as a valid measure of its wealth.[8] *See, e.g., W.H. Miner, Inc. v. Peerless Equipment Co.*, 115 F.2d 650, 655 (7th Cir.1940), *cert. denied*, 312 U.S. 687, 61 S.Ct. 615, 85 L.Ed. 1125 (1941) (term "net worth" merely signifies remainder after deduction of liabilities from assets). *Compare* Black's Law Dictionary 1041 (6th ed. 1990) (net worth is amount by which assets exceed liabilities or the difference between total assets and liabilities of individual, corporation, etc.). *See also In re Cooperman's*

---

8. *See also* Section V *infra* (discussing necessity of admitting evidence regarding defendant's financial worth when punitive damages are at issue).

*Estate,* 487 Pa. 148, 150–51 n. 2, 409 A.2d 8, 9 n. 2 (1979) (reproducing trial testimony of accountant that "net worth" is value of assets less liabilities).

PNI further objects to the fact that it was not permitted to introduce rebuttal evidence concerning the nature of its holdings and the meaning of the entries on its balance sheet. This argument overlooks the fact that PNI actually stipulated to the value its own net worth. PNI's action effectively forestalled discovery by Mr. Sprague of detailed information concerning PNI's financial condition and also prevented Mr. Sprague from learning about the existence and extent of any professional liability or malpractice insurance coverage available to PNI. Under these circumstances, the trial court's decision to exclude rebuttal evidence merely served to prevent PNI from reversing its pre-trial stance and selectively disclosing financial information once trial had begun. We agree with the lower court that it would be inherently unreasonable and unfair to permit a defendant to avoid divulging to the plaintiff non-quantified assets such as malpractice insurance while simultaneously granting the defendant the right to reveal selected liabilities to the jury. We note, moreover, that the very authorities upon which PNI relies agree that it is a sound defense strategy to prevent freewheeling financial discovery by stipulating to a specific net worth and that a simple statement regarding a defendant's total net worth provides a sufficient yardstick by which a jury may set a suitable punishment when it finds that punitive damages are appropriate. *See, e.g.* (cited by PNI): *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.,* 155 Cal.App.3d 381, 391, 202 Cal. Rptr. 204, 210 (Cal.Ct.App.1984) (net worth is the best measure of a defendant's wealth for purposes of assessing punitive damages); *Rupert v. Sellers,* 48 A.D.2d 265, 272, 368 N.Y.S.2d 904, 913 (1975) (since purpose of presenting evidence of defendant's wealth in a libel case is only to furnish jury with guide for suitable punishment, plaintiff need not explore details of defendant's assets and liabilities but may present mere statement of defendant's total net worth to jury); Gerald Reading Powell & Cynthia A. Leiferman, *Results Most Embarrassing:*

*Discovery and Admissibility of Net Worth of the Defendant,*
40 Baylor L.Rev. 527, 532–538 (Fall 1988) (existence of liability
insurance coverage is at heart of inquiry as to what amount of
damages is necessary to financially impair a wrongdoer; a
defendant facing possible admission of detailed evidence of its
financial condition and the extent of its liability insurance
coverage might consider offering to stipulate to its net worth
thereby avoiding discovery).

 In this context, PNI also contends that the trial
court erred in refusing to charge the jury concerning the
meaning of the net worth figure to which it had stipulated, or
to explain the entries on the balance sheet admitted as the
expression of that stipulated net worth. The question of
whether the jury should be instructed on a given point de-
pends upon the facts and the issues in a particular case.
*Ferrick Excavating and Grading Co. v. Senger Trucking Co.,*
506 Pa. 181, 190, 484 A.2d 744, 748 (1984). Where facts are in
dispute, the jury must be properly instructed so that they may
resolve the conflict. *Id.*

 In the instant case, there were no factual disputes
concerning PNI's net worth because the parties had agreed to
a stipulated figure. Thus, there was no reason for the trial
court to confuse the jury with detailed information concerning
a factual matter which was already resolved by agreement
between the parties, *i.e.,* that the net worth of PNI totalled
$102,215,290 as expressed on the balance sheet prepared by
PNI, submitted by Mr. Sprague as Plaintiff's Exhibit P–154,
and admitted without objection. *See* N.T. 4/6/90 at 19 (admis-
sion of exhibit). *See also Schneider v. Lindenmuth–Cline
Agency,* 423 Pa.Super. 73, 80, 620 A.2d 505, 508–09 (1993)
(trial judge may refuse point for charge which does not reflect
facts of case). As the trial judge correctly explained when
ruling on PNI's second set of supplemental points for charge,
PNI itself established the value of its corporate net worth and
it would be inappropriate in the jury charge to delve into the

accounting principles used to establish that figure. N.T. 5/2/90 at 3–4.[9]

### C. *Propriety of the Punitive Damage Award: Excessiveness*

PNI next contends that the punitive damages awarded in this case are excessive *per se*, in that the absolute dollar amount of the award is too high. It also claims that the award is disproportionate to: (a) the character of its act in publishing the articles at issue here; (b) the harm suffered by Mr. Sprague; and (c) to PNI's means to pay the punitive damage verdict. These assertions will be addressed *infra* at Section V.

### D. *Propriety of the Punitive Damage Award under Both Pennsylvania Law and the First Amendment*

In this regard, PNI argues that a jury may never confer punitive damages in any public official defamation case because the very possibility of such an award would chill the media's First Amendment rights.[10] PNI correctly states that Mr. Sprague's position as First Assistant District Attorney for Philadelphia County in 1973 causes him to be classified as a

---

9. The precedent cited by PNI in support of its contention that a trial court must always explain the meaning of the term "net worth" for a jury does not in fact express any such general requirement. For example, *In re Cooperman's Estate, supra,* merely reproduces a portion of a trial transcript setting forth an accountant's testimony as to the meaning behind the concept of "net worth." In *Cooperman's Estate,* our Supreme Court did not even remotely suggest that this type of testimony had to be offered in every case touching upon corporate net worth. We agree with PNI that the Commonwealth Court of Pennsylvania, in *City of Pittsburgh v. Milk Marketing Board,* 1 Pa.Commw. 300, 275 A.2d 115 (1971), directed the Board to provide an explanation of several terms, including "net sales," "cost of sales," "net worth," and "employed capital" upon remand. However, the difficulty faced by Commonwealth Court was not that the terms were incomprehensible to the court; rather, the problem was that the Board had failed to follow certain statutory provisions specifically required by the Legislature concerning its mandated system of accounting.

10. PNI has also presented arguments to the effect that the specific punitive damage award in this case violates the First Amendment because it is: (a) too large; and (b) bears no reasonable relationship to the compensatory damages awarded. These claims will be addressed *infra* at Section V (Remittitur).

"public official" for purposes of the instant defamation action. *Sprague v. Walter*, 357 Pa.Super. 570, 590, 516 A.2d 706, 717 (1986), *aff'd*, 518 Pa. 425, 543 A.2d 1078 (1988), *cert. denied*, 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988). We agree with PNI that the United States Supreme Court has published no case which squarely addresses the question of the proper assessment and limitation of punitive damages in the context of a libel action brought by a public official.[11] However, we cannot endorse PNI's view that we sail uncharted waters in this matter: a Pennsylvania appellate decision exists which has explicitly ruled that punitive damages in public official libel actions are consistent with both the First Amendment to the United States Constitution and with the laws of this Commonwealth. *DiSalle v. P.G. Pub. Co., supra*, 375 Pa.Super. 510, 544 A.2d 1345 (per Cirillo, J.).

In defamation actions, it is well-settled that a public official must prove actual malice before recovering compensatory damages. *Id.*, 375 Pa.Super at 559, 544 A.2d at 1370. The "actual malice" standard requires the plaintiff to establish that publication of an allegedly defamatory statement was made either with knowledge that the statement was false or with reckless disregard for its truth or falsity. *Id.*, 375 Pa.Super. at 547, 544 A.2d at 1364 (citing *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725, 11 L.Ed.2d 686, 706 (1964)). Proof of actual malice by a public official is constitutionally sufficient to trigger a jury's consideration of punitive damages. *Id.* 375 Pa.Super. at 551–52, 544 A.2d at 1366–67. Nevertheless, in order to recover both compensatory and punitive damages, the plaintiff must not only prove "actual malice," but must also demonstrate that the defendant acted with "common law malice" in publishing the defamatory

11. The United States Supreme Court has denied *certiorari* twice in recent history to lower court decisions involving challenges to punitive damage awards in public figure/public official libel cases. *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119 (7th Cir.1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988) (public figure) and *DiSalle v. P.G. Pub. Co.*, 375 Pa.Super. 510, 544 A.2d 1345 (1988), *appeal denied*, 521 Pa. 620, 557 A.2d 724 (1989), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989) (public official).

statement. *DiSalle v. P.G. Pub. Co.*, 375 Pa.Super. at 559, 544 A.2d at 1370 (see generally for excellent discussion on common law malice).

 "Common law malice" involves conduct that is outrageous (because of the defendant's evil motive or his reckless indifference to the rights of others), and is malicious, wanton, reckless, willful, or oppressive. *Id.*, 375 Pa.Super. at 547, 544 A.2d at 1364 (citing *Feld v. Merriam,* 506 Pa. at 395, 485 A.2d at 747–48 (adopting Restatement (Second) of Torts § 908(2) regarding punitive damages)). In determining whether a particular defendant's conduct displays the "necessary degree of evil volition," the focus is not on the nature or category of the tort, but rather on the defendant's disposition toward the plaintiff at the time of the wrongful act. *Id.* 375 Pa.Super. at 556, 544 A.2d at 1369. Thus, before punitive damages will be allowed in a case involving the defamation of a public official, the plaintiff must prove that the defendant displayed "actual or apparent ill will." *Id.* at 559, 544 A.2d at 1370. This is so because punitive damages in public official defamation actions are specifically intended to punish and deter publication with "actual or apparent ill will." *Id.* at 559, 544 A.2d at 1371. Therefore, in the context of a public official defamation action, punitive damages must be limited to only those cases where common law malice is shown.[12] *Id.* Proper application of the "common law malice" standard assures that a media defendant's rights are sufficiently protected under both the First Amendment and the Pennsylvania constitution. *See id. Compare SHV Coal, Inc. v. Continental Grain Co.,* 526 Pa. 489, 493, 587 A.2d 702, 704 (1991) and *Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 600 A.2d 545 (1991), *appeal denied,* 530 Pa. 666, 610 A.2d 46 (1992) (in general, assessment of punitive damages is proper whenever a party's actions are of such an outrageous nature as to demonstrate intentional,

12. Unlike compensatory damages, which have as their purpose the desire to make the plaintiff whole, punitive damages are awarded to . punish the wrongdoer and to deter both him and others from engaging in similar conduct in the future. *Feingold v. Southeastern Pennsylvania Transportation Authority,* 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986); Restatement (Second) of Torts § 908, comment a.

willful, wanton or reckless conduct resulting from either an evil motive or because of a reckless indifference to the rights of others).

Contrary to PNI's assertions, the purpose of punitive damage awards in a public official defamation case is not to punish and deter *speech.* Rather, punitive damages are granted in such cases to punish the defamer's "actual or apparent ill will" and to deter others from acting from "evil volition" when engaging in similar conduct. *DiSalle v. P.G. Pub. Co.,* 375 Pa.Super. at 559, 544 A.2d at 1371. The question of whether to actually award punitive damages turns on whether the *harm* resulting from specific defamatory speech was itself intentional and not merely an unintended or fortuitous result of the speech. *Id.* at 558, 544 A.2d at 1370.

Courts considering libel cases should be guided by the same general rules regarding damages that govern other types of tort recovery. *Id.* at 559, 544 A.2d at 1370. The standard of proof for punitive damages in Pennsylvania traditionally has been proof by a preponderance of the evidence. *Id.* at 560 n. 24, 544 A.2d at 1371 (citing *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 173, 494 A.2d 1088, 1098 (1985)). In a public official defamation case, the Superior Court of Pennsylvania will uphold a jury charge that comports with the Restatement (Second) of Torts § 908(1), which is the law in this Commonwealth concerning punitive damages. *DiSalle v. P.G. Pub. Co.,* 375 Pa.Super. at 560, 544 A.2d at 1371.

In this case, the trial court gave the following punitive damages charge:

If you find that the conduct of the defendant was outrageous, you may award punitive damages as well as any compensatory damages in order to punish the defendant for his conduct and to deter the defendant and others from the commission of like acts.

A person's conduct is outrageous when he acts with a bad motive or when he acts with reckless indifference to the interest of others.

N.T. 5/2/90 at 76–77. *Compare* Pennsylvania Selected Standard Jury Instruction (Civil) § 14.00—Punitive Damages (1984) (based on section 908 of the Restatement).[13] We conclude that this jury charge satisfies the requirements of *DiSalle, supra,* 375 Pa.Super. 510, 544 A.2d 1345.

Moreover, we endorse the trial court's determination that the evidence was sufficient to establish "common law malice," the necessary predicate to any award of punitive damages in a Pennsylvania public official defamation case. Among other things, the trial court noted that Mr. Walter was outspoken to both friends and work supervisors regarding his intention to destroy Sprague's career. Despite Mr. Sprague's attempts to communicate with high level corporate officers of both PNI and its parent company concerning Mr. Walter's smear campaign, no direct response was forthcoming. At the time PNI published the defamatory articles, Mr. Sprague was a relatively young man with a national reputation for both a high degree of competence and integrity. The articles permanently damaged Sprague's reputation, exactly as they were intended to do, and destroyed all hope of future public service employment. Furthermore, as a result of the articles, Mr. Sprague not only received "hate mail" from all over the country, he experienced anonymous threatening telephone calls. This constant pressure eventually caused Mr. Sprague to resign from his position in the District Attorney's Office.

Having been thwarted in his desire to run for the position of District Attorney, Mr. Sprague sought employment elsewhere as Chief Counsel and Director of the House of Representatives Select Committee on Assassination Investigation of the deaths of President Kennedy and the Reverend Dr. Martin

---

**13.** The relevant standard jury instruction on punitive damages contains the following language, virtually identical to that employed by the trial court:

> If you find that the conduct of the defendant was outrageous, you may award punitive damages, as well as any compensatory damages, in order to punish the defendant for his conduct and to deter the defendant and others from the commission of like acts.
> A person's conduct is outrageous when he acts with a bad motive or when he acts with reckless indifference to the interests of others.

Pennsylvania Selected Standard Jury Instruction (Civil) § 14.00 (1984).

Luther King. PNI intervened and sent copies of the defamatory material to key Congressional figures. Mr. Sprague thereafter endured the humiliation of being called to appear before a Select Congressional Committee to explain the material. He was ultimately compelled to resign this position also when his attempts to subpoena records were invariably blocked by the C.I.A. which cited the prior accusations of wiretapping irregularities and covering up a homicide. Thus, the defamatory articles accomplished the specific harm for which they were intended: Mr. Sprague's public service career was finished and his reputation was utterly destroyed.

On post-trial review, the trial court found that these facts were sufficient to establish the existence of "common law malice" in this case and we agree. As previously explained, under *DiSalle, supra*, the requirement that a plaintiff must prove "common law malice" adequately guards media defendants in public official defamation cases under both the federal and state constitutions. Since this element was fully established in the instant case, we conclude that PNI's constitutional rights were satisfactorily protected.

## V. EXCESSIVENESS OF DAMAGES/REMITTITUR

PNI requests either a new trial or a "substantial remittitur" in the instant case. Judicial reduction of a jury award for compensatory damages is appropriate only when the award is plainly excessive and exorbitant in a particular case. *Haines v. Raven Arms*, 536 Pa. 452, 456, 640 A.2d 367, 369 (1994) (reconsideration granted and case remanded June 7, 1994). It is well-settled that the large size of a verdict is in itself no evidence of excessiveness. *Layman v. Doernte*, 405 Pa. 355, 363, 175 A.2d 530, 534 (1962). Thus, PNI's argument must fail to the extent that it calls for reversal on the grounds that the compensatory damages exceed some non-existent absolute limit which purportedly caps defamation awards. The correct question on review is whether the award of damages "falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by

partiality, prejudice, mistake, or corruption." *Haines v. Raven Arms, supra* (citing *Carminati v. Philadelphia Transportation Co.,* 405 Pa. 500, 509, 176 A.2d 440, 445 (1962)).

The trial court may only grant a request for remittitur when a verdict that is supported by the evidence suggests that a jury was guided by partiality, prejudice, mistake or corruption. *Krysmalski by Krysmalski v. Tarasovich,* 424 Pa.Super. 121, 147, 622 A.2d 298, 312 (*en banc*), *appeal denied,* 535 Pa. 675, 636 A.2d 634 (1993). The grant or refusal of either a new trial or remittitur because of the excessiveness of the verdict is peculiarly within the discretion of the trial court and will not be reversed unless an abuse of discretion or error of law has been committed. *Haines v. Raven Arms, supra* (quoting *Scaife Co. v. Rockwell–Standard Corp.,* 446 Pa. 280, 290, 285 A.2d 451, 456–57 (1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972)). On appeal, the Superior Court is not free to substitute its judgment for that of the fact finder. *Botek v. Mine Safety Appliance Corp.,* 531 Pa. 160, 166, 611 A.2d 1174, 1176 (1992). Rather, it is our task to determine whether the lower court committed a "clear" or "gross" abuse of discretion when conducting its initial evaluation of a defendant's request for remittitur. *Id.* at 165, 611 A.2d at 1176.

As we have already explained, the defamatory articles at issue here permanently blotted Mr. Sprague's reputation for professional competence and personal integrity. They forced him to resign from two separate appointments to government employment positions and completely destroyed any hope that he could successfully run for elected office. Thus, Mr. Sprague's public service career involuntarily ended while he was still a relatively young man.[14] Moreover, Mr. Sprague and his family were forced to endure receiving both

14. Contrary to PNI's strident argument to the contrary, it is simply irrelevant that Mr. Sprague was able to find employment in the private sector. The point of Mr. Sprague's claim is not that he was deprived of all means of ever earning a livelihood, but that PNI deliberately ended his public service career and damaged his reputation as a law-abiding, law-enforcement individual.

"hate mail" and anonymous threatening telephone calls. In consideration of these facts, we do not find the compensatory verdict so shocking to this court's sense of justice that we can only attribute it to partiality, prejudice, mistake or corruption on the part of the jury. Rather, we find it to be soundly grounded in the evidence presented at trial. We affirm the lower court's action in this regard because we can discern neither abuse of discretion nor error of law in its decision to deny both a new trial and a remittitur as to the compensatory verdict only.

■■■ PNI next argues that the punitive damage award in this case is simply too large. The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 102, 555 A.2d 800, 803 (1989) (citing Restatement (Second) of Torts § 908(2)). *Accord Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 740–41 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992) (applying Pennsylvania law). It is for the jury to weigh these factors in arriving at an appropriate punitive damage award. *Kirkbride v. Lisbon Contractors, Inc., supra,* 521 Pa. 97, 555 A.2d 800. The excessiveness of punitive damages in a case in which they are allowable may be grounds for reversal, for a new trial, or for a remittitur under the usual rules by which the courts control the jury's award of compensatory damages. *See* Restatement of Torts (Second) § 908, comment d (function of jury). However, a trial judge may not declare a punitive damages verdict to be excessive simply because he or she might have awarded a lesser amount. *Sulecki v. Southeast National Bank,* 358 Pa.Super. 132, 138, 516 A.2d 1217, 1220 (1986) (*en banc* ).

As explained in detail, *supra,* the facts of this case are more than sufficient to demonstrate both "actual malice" and "common law malice." The jury was entitled to award punitive damages based on the outrageous conduct of both Mr. Walter and PNI in deliberately setting out to destroy Mr. Sprague's reputation and public service career. That the conduct pro-

duced the specific harm intended is patent. Thus, the jury was entitled to award punitive damages.

PNI further contends that the punitive damages awarded in this case are disproportionate to the compensatory damages and that permitting them to stand would violate PNI's constitutional rights under the Fourteenth Amendment. Under Pennsylvania law, punitive damages need bear no proportional relationship to the compensatory damages awarded in a particular case. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. at 103–04, 555 A.2d at 803. Rather, a reasonable relationship must exist between the amount of the punitive damage award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. *Id.* at 104, 555 A.2d at 803–04. Our Supreme Court has ruled that a mathematical proportionality requirement between punitive and compensatory damages would actually defeat the purpose of punitive damages, which is to punish tortfeasors for outrageous conduct and deter them and others from similar conduct.[15] *Id.* at 103, 555 A.2d at 803.

It is for this reason that the wealth of the tortfeasor is relevant. In making its determination, the jury has the function of weighing the conduct of the tortfeasor against the amount of damages which would deter such future conduct. In performing this duty, the jury must weigh the intended harm against the tortfeasor's wealth. If [the

**15.** Although a defendant's wealth is relevant to punitive damages, a jury may not consider it when setting compensatory damages. *Feld v. Merriam*, 506 Pa. 383, 396–97, 485 A.2d 742, 748 (1984). Where the trial court has failed to warn the jury that they may not consider the defendant's financial status in awarding compensatory damages, evidence of wealth may improperly prejudice the jury. *Id.* The drastic remedy of a new trial is not required where a sufficient cautionary instruction has overcome the prejudice triggered by the introduction of evidence concerning the defendant's assets. *Id.* at 397 n. 6, 485 A.2d at 748 n. 6. However, it may be necessary in some instances to set aside the compensatory damage award. *Id.* at 397, 485 A.2d at 748. In this case, it is unnecessary either to award a new trial or to vacate the compensatory award because the lower court properly explained to the jury the limited purpose for which they were to consider the evidence concerning PNI's wealth. *See* N.T. 5/2/90 at 76–79.

Supreme Court] were to adopt the [theory that punitive damages must be proportional to compensatory damages], outrageous conduct, which only by luck results in nominal damages, would not be deterred and the sole purpose of a punitive damage award would be frustrated. If the resulting punishment is relatively small when compared to the potential reward ..., it might then be feasible for a tortfeasor to attempt the same outrageous conduct a second time. If the amount of punitive damages must bear a reasonable relationship to the injury suffered, then those damages probably would not serve as a deterrent. It becomes clear that *requiring punitive damages to be reasonably related to compensatory damages would not only usurp the jury's function of weighing the factors set forth in Section 908 of the Restatement (Second) of Torts, but would also prohibit victims of malicious conduct, who fortuitously were not harmed, from deterring future attacks.*

*Id.* at 103–04, 555 A.2d at 803 (emphasis added). The Pennsylvania Supreme Court's holding that punitive damages need not be "reasonably related" to compensatory damages is best understood as a statement that no fixed mathematical ratio is required between the two figures.[16] Under Pennsylvania law, a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages. *Id.* 521 Pa. at 103–04, 555 A.2d at 803–04.

16. PNI's proportionality argument would be wrong in any event. First, PNI's contention that the ratio between small numbers is somehow more meaningful than the same relationship between large numbers makes no mathematical sense. The relationship between the numeric value of the compensatory and punitive damages in this case is 1 to 12.6 and remains the same whether the awards are respectively valued at $2.50 and $31.50, $250 and $3,150 or $2,500,000 and $31,500,000. We find it unnecessary to belabor this concept and merely note that the United States Supreme Court has more than once affirmed awards more mathematically disproportionate than the verdicts at issue here. *See, e.g., TXO Production Corp., v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality affirmance of punitive damages 526.3 times larger than compensatory damages); *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (upholding punitive damage award more than 200 times larger than compensatory award).

The United States Supreme Court recently explained that judicial review of the size of punitive damage awards has provided a safeguard against excessive verdicts for as long as punitive damages have been conferred. *Honda Motor Co., Ltd. v. Oberg,* —— U.S. ——, ——, 114 S.Ct. 2331, 2335, 129 L.Ed.2d 336, 343 (1994). A decision to punish a tortfeasor by exacting punitive damages is an exercise of state power which must comply with the Due Process Clause of the Fourteenth Amendment. *Id.* at ——, 114 S.Ct. at 2335, 129 L.Ed.2d at 342–43.[17] Because punitive damages pose an acute danger of arbitrary deprivation of property, due process requires judicial review of the size of punitive damage awards. *Id.* at ——– ——, 114 S.Ct. at 2340–41, 129 L.Ed.2d at 349–50.

In *Honda Motor Co. Ltd. v. Oberg,* 114 S.Ct. 2331, the Supreme Court explicitly declined to adopt or identify for the benefit of the bench and bar any particular standard of review which provides the level of scrutiny demanded by the Fourteenth Amendment. *Id.* at —— n. 10, 114 S.Ct. at 2341 n. 10, 129 L.Ed.2d at 350 n. 10. However, the Supreme Court did indicate that traditional verbal formulations which focus on "passion and prejudice," "gross excessiveness," or whether the verdict was "against the weight of the evidence" may satisfy due process as "rough equivalents" of the standard which they previously articulated in *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560, 576–77 (1979), *i.e.,* "whether 'no rational trier of fact could have' reached the same verdict." *Id.*[18] *See also Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1, 20 (1991) (no "mathematical bright line can be drawn

17. *See also Browning–Ferris v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (Excessive Fines clause of Eighth Amendment does not apply to punitive damages award in cases between private parties).

18. Although the Supreme Court cited *Jackson v. Virginia, supra,* 443 U.S. 307, 99 S.Ct. 2781, in the context of reviewing a punitive damage award, that case specifically held that an applicant is entitled to habeas corpus relief in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 [28 U.S.C.S. § 2254], "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324, 99 S.Ct. at 2791, 61 L.Ed.2d at 576–77.

between the constitutionally acceptable and the constitutionally unacceptable that would fit every case"; however "general concerns of reasonableness and adequate guidance from the [trial] court when the case is tried to a jury properly enter into the constitutional calculus"). Despite the absence of an exactitude of measurement in determining punitive damages, the U.S. Supreme Court has left open to the fair judgment and judicial discretion of the state courts the evaluation of the punishment and deterrence objectives of punitive damage awards.

▌ The Pennsylvania Supreme Court has never espoused any rule antithetical to the position of the United States Supreme Court's decision in *Honda Motor Co., Ltd. v. Oberg*, 114 S.Ct. 2331. Pennsylvania law is quite clear that the courts of this Commonwealth have the power to review a jury's award of punitive damages for excessiveness. Although the standard of measure requires no comparison between the value of the compensatory damages and the total of the punitive damages, Pennsylvania courts must determine whether the punitive damage award advances the dual goals of punishment and deterrence and is disproportionate to the character of the tortious act, to the harm suffered by the plaintiff, and to the wealth of the defendant. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. at 103–04, 555 A.2d at 803–04. Our courts are fully empowered to remit punitive damages whenever the award is shocking to the court's sense of justice. *Id.* The evaluation in such cases is subject to appellate review under an abuse of discretion standard. *Id.*

The Pennsylvania standard applied in *Kirkbride* compares favorably with the Alabama standard articulated in *Hammond v. City of Gadsden*, 493 So.2d 1374 (1986), which the United States Supreme Court approved in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. at 20–21, 111 S.Ct. at 1043, 113 L.Ed.2d at 21–22 (1991). Alabama requires its trial courts to explain the reasons for either letting a jury's punitive damage verdict stand or interfering with it on the grounds of excessiveness. In Alabama, the appropriate factors for the trial court's consideration include the culpability of the defendant's

conduct, the desirability of discouraging others from similar conduct, the impact upon the plaintiff, and the impact on innocent third parties. *Id.* at 20–21, 111 S.Ct. at 1044, 113 L.Ed.2d at 21.[19] The United States Supreme court has determined that the type of post-verdict review provided by the Alabama courts ensures that punitive damages are not grossly disproportionate to the severity of the offense and have some understandable relationship to the compensatory damages awarded. *Id.* at 22, 111 S.Ct. at 1045, 113 L.Ed.2d at 22. For all of these reasons, the United States Supreme Court determined that Alabama's method of handling punitive damages meets the requirements for Due Process under the Fourteenth Amendment.

As explained in *Kirkbride, supra,* 521 Pa. 97, 555 A.2d 800, the Pennsylvania standard, like the Alabama standard, requires the trial court to evaluate whether the amount of a punitive damages award bears a reasonable relationship to the character of the tortious act, the nature of the plaintiff's harm, the extent of the harm suffered, the wealth of the defendant, and the deterrent effect of the award. *Accord DiSalle v. P.G. Pub. Co., supra,* 375 Pa.Super. 510, 544 A.2d 1345. Essentially, the two jurisdictions base their analyses of punitive damages on the principles of punishment and deterrence. In both states, the jury's discretion concerning punitive damages is not unfettered. In the first instance, the trial court reviews any punitive damages verdict for excessiveness and may remit the award whenever it is shocking to the court's sense of justice. Moreover, appellate review in both jurisdictions applies identical standards to determine whether the trial judge committed

19. In particular, the Alabama standard considers whether there is (a) a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of any criminal sanctions on the defendant for his conduct, viewed as a mitigating factor; and (g) the existence of other civil awards against the defendant for the same conduct, also to be taken in mitigation. *Id.* at 21–22, 111 S.Ct. at 1045, 113 L.Ed.2d at 22.

any abuse of discretion in making his or her ruling. *See Sulecki v. Southeast National Bank, supra,* 358 Pa.Super. 132, 516 A.2d 1217 (explaining both levels of review under Pennsylvania law). The Pennsylvania standard clearly established by our Supreme Court appears to fully comport with the Alabama standard approved by the United States Supreme Court as satisfying the requirements of due process. *See W.W. Management and Development Company, Inc. v. Scottsdale Insurance Co.,* 769 F.Supp. 178, 180–81 (E.D.Pa.1991) (Pennsylvania law makes considerable effort to ensure that punitive damage awards are reasonable and satisfy due process; the Pennsylvania system "kicks in" before the jury considers the matter and provides supervision throughout the appeal process); *Loughman v. Consol–Pennsylvania Coal Co.,* 740 F.Supp. 1114, 1124 (W.D.Pa.1990), *aff'd in part, vacated on other grounds in part sub nom. Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594 (3d Cir.1991), *cert. denied,* 504 U.S. 955, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992) (Pennsylvania law protects against excessive punitive damages by providing adequate guidelines for jurors when calculating amount of award and permitting court to remit damages to more reasonable amount if punitive damages are so disproportionate as to shock the court's sense of justice when considering character of act, nature and extent of harm, and wealth of defendant). We therefore find no conflict between the law of Pennsylvania concerning punitive damages and the Fourteenth Amendment.

We are aware that several recently published articles have raised questions regarding the validity and continued viability of large punitive damage awards. *See, e.g.,* Nicole B. Casarez, *Punitive Damages in Defamation Actions: An Area of Libel law Worth Reforming,* 32 Duq.L.Rev. 667 (Summer 1994); Gerald Powell & Cynthia A. Leiferman, *Results Most Embarrassing: Discovery and Admissibility of Net Worth of the Defendant,* 40 Baylor L.Rev. 527 (Fall 1988); Stephan Daniels, *Punitive Damages: The Real Story,* 72 A.B.A.J. 60 (August 1986); William W. Van Alstyne, *First Amendment Limitations on Recovery from the Press,* 25 Wm. & Mary L.Rev. 793

(1984). We are also fully cognizant of the fact that the Supreme Court of the United States has ruled that there must be some reasonable relationship between compensatory and punitive damages. *See Honda Motor Co. Ltd. v. Oberg, supra,* 114 S.Ct. 2331. In *Honda Motor Co. Ltd. v. Oberg,* the United States Supreme Court declined to establish any definitive bright-line rule applicable to the review of punitive damages. However, as we have indicated, there is direct language in *Honda Motor* which justifies our state courts in reducing punitive damage awards for excessiveness.

There is no question that Mr. Roberts and his reporters have presented a shocking lapse in their responsibility to print the truth. Their derelictions go so far as to include losing many important pieces of evidence, which raises the plausible inference that no such evidence ever existed. The manner in which Mr. Roberts dissembled is equally shocking as we discussed earlier in this opinion. Despite the clear evidence of malice on the part of Walter and his co-reporters and the knowledge of this conduct on the part of Mr. Roberts, the question, as we have said, remains as to how much punitive damages, based on the principle of punishment and consequential restraint, is a sufficient deterrent.

The United States Supreme Court has clearly indicated that the trial and appellate courts of the various states must provide meaningful review of the amount of punitive damages awarded by a jury in any given case. *Honda Motor Co. Ltd. v. Oberg, supra,* 114 S.Ct. 2331. It is equally plain that Pennsylvania law requires our Courts of Common Pleas, in the first instance, to consider the reasonableness of a jury's decision in this regard and to affirm the jury's action, or, as the case may require, to grant either an additur or remittitur. Secondarily, the law of this Commonwealth calls for the appellate courts to determine whether the trial court has committed any abuse of discretion when reviewing a jury's punitive damage verdict, or whether on complete and exhaustive review of the record it shocks the court's sense of justice in a given case. *See, e.g., Haines v. Raven Arms,* 536 Pa. at

452, 640 A.2d at 369 (discussing considerations proper to determining when a verdict is shocking to the court's conscience).

The facts necessary to prove punitive damages are aptly explained in *Kirkbride v. Lisbon Contractors, Inc., supra,* 521 Pa. 97, 555 A.2d 800. There the court has indicated that the true test is to determine whether the award of punitive damages shocks the court's sense of justice when considering the following facts in determining the purpose or lack of excessiveness of the award, to-wit:

 (1) Whether the amount of punitive damages award bears a reasonable relationship to the character of the defamation act;

 (2) The nature of the plaintiff's harm;

 (3) The extent of the harm suffered;

 (4) The wealth of the defaming party;

 (5) The deterrent effect of the award.

*Id.,* 521 Pa. at 103–04, 555 A.2d at 803–04.

It becomes apparent that a reasonable relationship must exist between the amount of punitive damages award and the twin goals of punishment and deterrence. We find no requirement here to be ultimately concerned with any fixed standard or formula in determining a relationship between compensation and punitive damages. As to this concern regarding compensation vis-a-vis punitive damages, our Supreme Court has said, "requiring punitive damages to be reasonably related to compensation damages would not only usurp the jury's function set forth in § 908 of the Restatement (2d) of Torts, but would also prohibit victims of malicious conduct who were not fortuitously harmed from deterring future attacks." *Id.* at 103–94, 555 A.2d at 803. Thus, to determine the justifiability of punitive damages, the nature of the defamatory utterance or writing, the harm done to the person attacked, the extent of the harm suffered, the wealth of the defaming party, and the deterrent effect of the award should be the predominant considerations.

Although Walter's mental and emotional problems were relevant and properly admissible for the jury's consideration

on the issues of both actual and common law malice, this evidence also played a most important part in the jury's decision on the issue of punitive damages. It produced prejudice and bias against PNI and resulted in an inordinately large verdict. Unfortunately, Pennsylvania cases concerning the issue of excessiveness of damages in tort actions give little guidance in libel and defamation cases. A plaintiff's physical and mental damages are specifically accountable and well-describable in tort actions stemming from a personal injury. *See, e.g., Haines v. Raven Arms, supra,* 536 Pa. 452, 640 A.2d 369; *Stoughton v. Kinzey,* 299 Pa.Super. 499, 502–03, 445 A.2d 1240, 1242 (1982); *Kemp v. Philadelphia Transportation Co.,* 239 Pa.Super. 379, 382–83, 361 A.2d 362, 364–65 (1976). With the limited exception of the concept of "pain and suffering," the type of highly specific medical testimony presented in a personal injury case does not invite undue jury speculation as to the quantum of harm suffered or the amount of money needed to fairly recompense the plaintiff. In libel actions, on the other hand, the amount of harm inflicted upon a good reputation is extremely difficult to quantify in terms of dollars.

Moreover, the nature of the elements to be proved in these two types of tort cases is quite different. Only in extremely rare circumstances would a personal injury suit discuss the motivation behind the defendant's actions and such a case almost never involves any question of malice or ill-will. However, a defamation case invariably focuses upon the defendant's motivation for making the allegedly defamatory utterances. Furthermore, a public figure who claims libel must always prove "actual malice" as an element of the tort. Thus, in a public figure defamation case, the jury repeatedly hears such terms as "malice," "actual malice," "ill-will," and "common law malice." Thus, a large portion of the trial testimony is admitted for the sole purpose of demonstrating that the defendant acted with the requisite "malice."

While the grant or refusal of a new trial or remittitur because of excessiveness is peculiarly within the discretion of the trial court and will not be reversed unless an abuse of discretion or an error of law has been committed, we, as an

appellate court, can upon proper basis and reason find that the trial court has abused its discretion in either upholding or remitting damages. *See Honda Motor Co. Ltd. v. Oberg, supra,* 114 S.Ct. 2331; *Haines v. Raven Arms, supra,* 536 Pa. 452, 640 A.2d 369. Having said this, we will consider whether a 31.5 million dollar punitive damage award in this case is excessive. There is no question that the articles of March 31 and April 1, 1973 were maliciously drawn at the hands of PNI. There is no question the serious harm which was done to and suffered by Mr. Sprague as a man having enjoyed a public career without blemish. But we are reluctant to say, in the long view of this twenty-year or more old case, that the damage done to Sprague's good name is as irretrievable as an award of 31.5 million dollars in punitive damages would indicate.

It is true that the punitive damages were meant to punish and to deter a recurrence of defamatory acts, but the punitive damages principle doesn't set forth in any clear language that it is also proper to economically cripple and disable a violator such as PNI in the operation of its most important public function of disseminating news so long as it is honest and truthful. It is evident that an amount in punitive damages high enough to be a continuous warning to publishers or disseminators of news not to cross the line from the freedom of the press to the equally important area of the right of privacy in violation of the law would be in consonance with the requirement and purpose of the law of punitive damages. In balancing the facts and the evidence in an inordinately voluminous record, we find the verdict of 31.5 million dollars in punitive damages in favor of Mr. Sprague to be excessive and to shock this court's sense of justice.

Throughout this long trial, the lower court permitted the jury to hear evidence of reporter Walter's mental and emotional problems so unnecessarily excessive in nature and extent as discussed above, that it could not help but arouse prejudice in the minds of the jury. In addition, the trial court permitted plaintiff to engage in a lavish account of irrelevant evidence of reporter Walter's sexual experience with a transvestite, which could only have contributed to the jury's preju-

dice against PNI when they considered the level of punishment to be imposed via punitive damages. Accordingly, the learned trial court abused its discretion in not granting a new trial limited to the question of punitive damages, and in not recognizing that a remittitur of the existing punitive damage award is appropriate. *See Honda Motor Co. Ltd. v. Oberg*, *supra*, 114 S.Ct. 2331 (discussing the proper role of the appellate courts in determining when a remittitur is necessary). We therefore submit the matter for a new trial limited to determining the amount of punitive damages unless the plaintiff accepts a remittitur of 10 million dollars thereby reducing the total amount of the punitive damage award from 31.5 million dollars to 21.5 million dollars.

## VI. DELAY DAMAGES

■ Finally, Mr. Sprague complains that he is entitled to receive delay damages because the impairment inflicted upon his previously impeccable reputation should be deemed a protected property loss within the meaning of Pa.R.C.P. No. 238, 42 Pa.C.S.A. (Delay Damages). We disagree. This Court has explicitly ruled that delay damages may not be added to compensatory awards in libel actions. *Oweida v. Tribune Review Publishing Co.*, 410 Pa.Super. 112, 144–46, 599 A.2d 230, 246–47 (1991), *appeal denied*, 529 Pa. 670, 605 A.2d 334 (1992). Unless or until the Pennsylvania Supreme Court reverses this decision, it continues to govern libel actions in this Commonwealth.

Affirmed in part; reversed in part. The judgment as to compensatory damages is affirmed in the amount of 2.5 million dollars; the judgment as to punitive damages in the amount of 31.5 million dollars is vacated. The case is remanded to the trial court for a new trial limited solely to the amount of punitive damages or, in the alternative, a remittitur in the amount of 10 million dollars with entry of a new judgment as to punitive damages totalling 21.5 million dollars. Jurisdiction is relinquished.