## Martin v. National Grange Mutual Insurance Company

C.P. of Centre County, no. 2000-0527.

*James K. Thomas II* and *Brooks R. Farland,* for plaintiff.

*John W. Heslop Jr.,* for defendant.

GRINE, *J.,* November 15, 2000—A hearing was held in the above-captioned matter on August 14, 2000. As a

default judgment was previously entered, the sole purpose of the August 14, 2000 hearing was for the assessment of damages as to defendant National Grange Insurance Company. Based on the testimony presented during the hearing and upon review of the briefs, proposed findings of fact and suggested conclusions of law, this court enters the following opinion and order.

## FINDINGS OF FACT

(1) NGM received notice of plaintiff Ralph Martin, t/d/b/a Colyer Dry Kiln's (Colyer) claim against NGM's insured, Ebac Systems Inc., on June 12, 1995.

(2) An NGM adjuster, supervisor and claim manager collectively executed a home office management report, dated June 14, 1995, which acknowledged that NGM needed an opinion from counsel as to whether the insurance policy issued to Ebac provided coverage for the Colyer claim.

(3) NGM retained William Black, Esq., to provide a coverage opinion.

(4) On July 11, 1995, Attorney Black provided an oral opinion to NGM that it would be difficult to deny coverage for the claims against Ebac.

(5) Colyer filed a writ of summons against Ebac in August 1995.

(6) NGM neither hired counsel to defend Ebac, nor ruled Colyer to file a complaint.

(7) On or about October 24, 1995, NGM District Claim Manager Steve Bracewell had a telephone conversation with Attorney Black wherein Attorney Black restated his

opinion that there appeared to be merit to the Colyer claim.

(8) On November 28, 1995, Mr. Bracewell had another telephone conversation with Attorney Black wherein Attorney Black opined that (1) NGM was probably "on the hook" for damages that occurred during the policy period, and (2) NGM should defend Ebac under a reservation of rights.

(9) NGM received a copy of the Colyer complaint on or about October 29, 1996.

(10) NGM requested two extensions of time from Colyer's counsel in order to respond to the complaint.

(11) On December 5, 1996, NGM Adjuster Tracey Robinson, during a telephone conversation with Attorney Black's law firm, advised his firm to wait for further instruction before preparing and/or sending a coverage opinion.

(12) On December 11, 1996, contrary to advice and opinions received by Attorney Black, Adjuster Robinson told counsel for Ebac she did not see a trigger for coverage under the NGM policy, and that she would obtain an independent coverage opinion and get back to counsel for Ebac with a formal response.

(13) On January 10, 1997, District Claim Manager Justin Davis instructed Adjuster Robinson to get a coverage opinion from an attorney other than Attorney Black.

(14) As Attorney Black did not hear from Adjuster Robinson since the December 5, 1996 telephone conversation, Attorney Black wrote to Adjuster Robinson inquiring whether NGM still needed a coverage opinion.

(15) On April 2, 1997, Adjuster Robinson discussed the case with an attorney from a different law firm, possibly located in Hollidaysburg, Pennsylvania. Adjuster Robinson noted in her file that said attorney "will review for coverage issues."

(16) In a letter dated December 22, 1997, Attorney Black again wrote a letter to inquire whether he should provide a coverage opinion or if his firm should close its file.

(17) Adjuster Robinson, in a letter dated December 30, 1997, instructed Attorney Black that a coverage opinion was not necessary and that Attorney Black should close his file.

(18) On March 25, 1998, Attorney Black wrote to NGM confirming NGM's instruction to not prepare a coverage opinion and that Attorney Black was closing his file without billing regardless of the fact Attorney Black had performed research and prepared a partial coverage opinion.

(19) NGM never received a written coverage opinion from any attorney.

(20) NGM violated its own internal guidelines by never explaining its coverage position to Ebac.

(21) NGM never hired counsel to defend Ebac under a reservation of rights.

(22) NGM never instituted any formal legal proceedings to determine its obligations and responsibilities under the policy to Ebac.

(23) NGM admits the complaint triggered a duty to defend Ebac under a reservation of rights.

(24) Ebac was forced to hire its own counsel and defend itself.

(25) Following jury selection and with potential compensatory damages in excess of $235,000 plus punitive damages, Ebac settled the case with Colyer for $130,000.

(26) The parties stipulated the amount of settlement, $130,000, is fair and reasonable.

(27) Ebac paid counsel fees in the underlying lawsuit in the amount of $62,245. Said amount is fair and reasonable.

(28) District Claim Manager Justin Davis left NGM's Richmond office in January 1999.

(29) Duane Regan assumed the Richmond office position of district claim manager in August 1999.

(30) There was no district claim manager in the Richmond office from January 1999 through August 1999.

(31) Despite their knowledge that a complaint had been filed against an insured, Ebac, and despite awareness of and/or involvement in the pending coverage issues, no one in a management or supervisory position at NGM performed any kind of substantive review of the file for almost three years.

(32) Although NGM Supervisor Starbuck participated in the decision regarding obtaining a coverage opinion, Supervisor Starbuck made an entry in the file running notes on October 15, 1999, almost one year after the underlying case was settled, inquiring whether Adjuster Robinson should close the file. The note stated that "This file has not had any activity in 2-1/2 years. . . ."

(33) Despite the fact that issues regarding Ebac's settlement with Colyer and the numerous coverage issues were clearly indicated by a review of the file's running notes, on December 9, 1999, District Claim Manager Regan reviewed the running notes and advised Adjuster Robinson the file should be closed.

(34) District Claim Manager Regan did not retrieve and review the paper file prior to instructing Adjuster Robinson to close the file.

(35) On December 17, 1999, Adjuster Robinson closed the file.

(36) As of the date the file was closed, NGM had not expended a single dollar on expenses.

(37) Adjuster Robinson was interviewed for the litigation specialist job in April 1996.

(38) Jerry Cox, senior claims consultant at NGM's home office, noted in his interview evaluation that "[Robinson] understands the litigation process and the need for financial control."

(39) Robinson assumed the job of litigation specialist in the Richmond office on June 1, 1996.

(40) On or about May 19, 1997, District Claim Manager Davis performed Robinson's first job performance appraisal. Robinson was praised for securing flat-fee arrangements with local counsel, which "[r]esulted in [a] significant decrease in our legal expenses. Goal exceeded. Expense control—100 percent satisfaction."

(41) Immediately thereafter, Robinson received a 7.12 percent salary increase.

(42) Robinson's performance was again evaluated on June 4, 1998. Robinson was honored with NGM's Circle of Excellence Award as "her control of the legal expenses had a significant impact on this office's reduction in ALAE (principally legal expenses) in 1997."

(43) The 1998 performance appraisal also noted:

"Done an excellent job in controlling legal expenses.

"100 percent compliance on extension usage, suit referral and expense control. . . .

"Key areas of litigation management and expense control resulted in this office's turnaround in 1997."

(44) Robinson received a $1,800 salary increase immediately thereafter.

(45) Robinson's 1999 performance appraisal noted that Robinson "needs to renew emphasis on expense control as it is as much part of her job as investigating and settling claims."

(46) Robinson did not receive any award, bonus or salary increase following the 1999 review.

(47) The instant bad faith action was filed against NGM in March 2000.

(48) A default judgment was entered against NGM on May 1, 2000.

(49) District (presently Regional) Claim Manager Regan stated during the August 14, 2000 hearing that this was the worst file handling he had ever seen.

(50) NGM's total assets, as of December 31, 1999, are $525,874,000.

(51) Approximately $320,000,000 of NGM's total assets are liquid assets or those easily convertible to cash.

(52) NGM earned $17,032,000 in investment income.

(53) NGM's policyholder surplus or net worth has grown approximately 50 percent over the last five years.

(54) As of December 31, 1999, NGM's policyholder surplus or net worth was $265,708,000.

(55) An award of punitive damages against NGM in the area of 2.65 million dollars, one percent of NGM's net worth, only changes NGM's key ratios approximately one percent. Such an award would not make NGM financially incapable of responding to and handling claims of its policyholders or adversely affect NGM's ability to operate as a business enterprise.

(56) NGM breached its duty of good faith and fair dealing to its insured, Ebac.

(57) NGM elevated its own financial interests above its duties to the insured.

(58) NGM's management consciously disregarded the advice NGM received from counsel it hired to render a coverage opinion.

(59) NGM's coverage counsel, who opined NGM had a duty to defend Ebac under a reservation of rights agreement, was terminated by NGM.

(60) NGM failed to disclose to its insured the advice it received from NGM's coverage counsel.

(61) NGM lied to its insured about whether NGM had a duty to provide a defense.

(62) NGM failed in its promise to the insured to obtain an independent coverage opinion and advise its insured accordingly.

(63) NGM, by placing emphasis on, and rewards for, reducing counsel fees, provided incentives for bad faith behavior from NGM's claim handlers.

(64) NGM's management failed to fulfill one of its principal functions of supervising claim handlers to make certain policyholders' rights were protected.

(65) NGM's behavior was outrageous and recklessly indifferent toward its insured.

## CONCLUSIONS OF LAW

(1) Because a default judgment has been entered against NGM in this case, NGM is deemed to have admitted well pleaded facts and that NGM breached its contract with, and acted in bad faith toward, its insured, Ebac. *Fox v. Gabler,* 534 Pa. 185, 626 A.2d 1141 (1993); *Lawrence v. General Medicine Ass'n Ltd.,* 412 Pa. Super. 163, 602 A.2d 1360 (1992).

(2) Because of its admitted breach of contract, NGM is obligated to reimburse Ebac for the settlement that Ebac funded, $130,000, plus fees Ebac paid to Ebac's defense counsel, $62,245. Said amounts total $192,245.

(3) Pennsylvania's bad faith statute, effective July 1, 1990, is codified at 42 Pa.C.S. §8371, and provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorney fees against the insurer." 42 Pa.C.S. §8371.

(4) Because of its admitted bad faith conduct toward Ebac, NGM is also liable for interest on the amount of the claim, court costs and punitive damages. 42 Pa.C.S. §8371.

(5) Pursuant to section 8371, interest is awarded from June 12, 1995, when Ebac first requested that NGM respond to the claim asserted against Ebac by Colyer. Using that date, interest compounded annually at the prime rate plus 3 percent totals $142,763.

(6) Pennsylvania has adopted section 908 of the Restatement (Second) of Torts, which provides:

"(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

"(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." Restatement (Second) of Torts §908; see also, *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984) (adopting section 908).

(7) An insurer acts in bad faith with respect to a claim if it (1) did not have a reasonable basis for denying benefits under the policy and (2) if it knew or recklessly disregarded its lack of a reasonable basis in denying the claim. *Terletsky v. Prudential Property and Casualty Insurance Co.,* 437 Pa. Super. 108, 649 A.2d 680 (1994), *alloc. denied,* 540 Pa. 641, 659 A.2d 560 (1995).

(8) In assessing punitive damages, the courts have typically considered three things: the character of the act, the nature and extent of the harm caused, and the wealth of the defendant. *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 100, 555 A.2d 800, 802 (1989).

(9) Punitive damages in Pennsylvania are not intended as compensation to the injured plaintiff, but are a penalty, imposed to punish the defendant and to deter him and others from similar outrageous conduct. *Voltz v. General Motors Acceptance Corp.,* 332 Pa. 141, 2 A.2d 697 (1938); *Esmond v. Liscio,* 209 Pa. Super. 200, 224 A.2d 793 (1966), *alloc. denied.*

(10) The only limitation on the amount of punitive damages that can be awarded in Pennsylvania is that the award cannot be excessive. *BMW v. Gore,* 517 U.S. 559, 134 L.Ed.2d 809 (1996) (discussing the ratio of punitive damages to the actual harm inflicted on the plaintiff and noting that, "in most cases, the ration will be well within a constitutionally acceptable range. . . . when the ratio is a breathtaking 500 to one, however, the award must surely 'raise a judicial eyebrow.' "); *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 125 L.Ed.2d 366 (1993) (no federal judicial eyebrow raised at a 10 to one ratio).

(11) Unlike federal law, Pennsylvania does not require a proportionality between the amount of the compensatory damages and the amount of punitive damages. In fact, a mathematical proportionality (under Pennsylvania law) would actually defeat the purpose of punitive damages—to punish tort-feasors for outrageous conduct and deter them from similar conduct. *Kirkbride, supra; Sprague v. Walter,* 441 Pa. Super. 1, 656 A.2d 890 (1995), *alloc. denied,* 543 Pa. 695, 670 A.2d 142 (1996), 543 Pa. 730, 673 A.2d 336 (1996).

(12) Courts have upheld and endorsed punitive damages awards of $150,000 where the underlying underinsured motorist claim was only $15,000—a 10 to one ratio and the ratio of around one percent of the defendant's net worth for a punitive damages award. *Wood v. Allstate,* 1997 U.S. District LEXIS 14663 (E.D. Pa. 1997); *Dunn v. HOVIC,* 1 F.3d 1371, 1383 (3d Cir. 1993), *cert. denied,* 510 U.S. 1031 (1993).

(13) NGM, at all times, had an obligation to place the interests of Ebac in the same light as its own interests. *Cowden v. Aetna Casualty and Surety Co.,* 389 Pa. 459, 134 A.2d 223 (1957).

(14) This court finds, by clear and convincing evidence that NGM's behavior (1) constituted a breach of contract insurance with Ebac, (2) constitutes "bad faith" as contemplated in section 8371, and (3) was outrageous because NGM acted with reckless indifference toward Ebac, its insured.

(15) Plaintiff is entitled to punitive damages in an amount approximately 10 times the amount of compensatory damages.

(16) Accordingly, plaintiff is entitled to an award of damages, including an award of punitive damages as follows:

| | |
|---|---|
| (1) Reimbursement for the underlying settlement | $130,000 |
| (2) Reimbursement for the counsel fees incurred | $62,245 |
| (3) Interest pursuant to section 8371 | $142,763 |
| (4) Punitive damages | $3,350,000 |
| TOTAL: | $3,685,008 |

(17) Pursuant to 42 Pa.C.S. §8371, plaintiff is entitled to reimbursement for the counsel fees and costs incurred in the instant matter, subject to approval by this court.

## ORDER

And now, November 15, 2000, after a hearing on damages and upon review of the proposed findings of fact and suggested conclusions of law, it is ordered and decreed that judgment is entered in favor of plaintiff Ralph Martin, t/d/b/a Colyer Dry Kiln, as assignee/subrogee for Ebac Systems Inc., Ebac Inc., and Ebac Ltd., and against defendant National Grange Mutual Insurance Company in the amount of $3,685,008.

It is further ordered that plaintiff Ralph Martin, t/d/b/a Colyer Dry Kiln, as assignee/subrogee for Ebac Systems Inc., Ebac Inc., and Ebac Ltd., is entitled to reimbursement for attorneys' fees and costs incurred in the instant matter, subject to approval by this court.